**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GERALD HAYDEN,

    Plaintiff,

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATON, PABLO
SUAREZ and SHANKER
RAMAMURTHY,

    Defendants.

Civil Action No.

_____

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Gerald Hayden ("Plaintiff" or "Hayden") files this action against Defendants International Business Machines Corporation ("IBM"), Pablo Suarez, and Shanker Ramamurthy (collectively, "Defendants" or "Individual Defendants," as appropriate) for theft of trade secrets and intellectual property in violation of 18 U.S.C. § 1831, *et seq.* (the "Defend Trade Secrets Act"), trade secret misappropriation, breach of contract, violation of the covenant of good faith and fair dealing, unjust enrichment, tortious interference with prospective economic advantage, and unlawful and retaliatory discharge.  Plaintiff seeks a declaratory judgment, an injunction, and compensatory and punitive damages, including but not limited to a share of profits from IBM's Hybrid Cloud, Cloud Pack 4 Data, Business Process Platform, Promontory Integrated Risk and

1

Compliance, IBM Cognitive Enterprise, Sales Force and Consulting Services, and related products and services developed, marketed and/or sold with Plaintiff's intellectual property or ideas.

I.     **INTRODUCTION**

1.     This is an action for theft of trade secrets and intellectual property by one of the most renowned global technology companies in the world – IBM.

2.     For decades IBM was the leader in office hardware and mainframe computing, but despite decades of industry leadership in this segment, IBM now trails behind the likes of Amazon, Google, Microsoft and other competing consulting firms, and struggles to remain relevant in the technology sector.

3.     After abandoning the personal computing ("PC") market with the sale of Lenovo, IBM has tried to hold itself out as the leader in Artificial Intelligence (e.g. Watson) and software development, and since then has begun to offer cloud computing services (e.g. Hybrid Cloud) – the services and products that are projected by experts to dominate the information technology ("IT") field in years to come.  But without any clear strategy or plan, IBM offered no competitive solutions and made few inroads in these areas.  Enter Gerald Hayden.

4.     Plaintiff Gerald Hayden is a 42-year veteran of the global banking and financial services industries.  He possesses a rare combination of banking, operational, financial and technological experience and expertise.  His experience across different sectors, and intimate knowledge of the banking industry, is unmatched.  Beginning with stints at Shawmut (now Bank of America) and MetLife, for decades Hayden worked on some of the most important financial services platforms in the industry.  He was also co-author of WebSphere at IBM in the 1990s, and as Senior Banker of Global Financial Services for Cisco in the early 2000s, he developed

2

financial service and mobile strategy solutions for Juniper Networks and Good Technology (now Blackberry), and as a Principal of Trident Consulting, he worked for the multinational financial institution of JPMorgan Chase and other clients in the field of business process re-engineering and mobile strategy. Hayden also is a six-time Master Black Belt certified expert in Six Sigma, the world's leading methodology for improving business processes and workflows.

5.      Employing his mastery of the intersection between banking, operations, financial and technological platforms, Plaintiff Hayden developed over a ten-year period a revolutionary business methodology that could become transformative for global banking and financial services industry: Awareness to Execution (a.k.a. "A2E"), and its derivative, Efficiency, Effectiveness, Real Time (a.k.a. "EERT") (collectively, "A2E").

6.      By 2009, Plaintiff Hayden had privately developed A2E, which was reflected in a comprehensive PowerPoint presentation and supporting materials. A2E has many details and levels, but at its highest level, A2E permits the client to integrate work-flows across numerous separate and siloed departments and divisions, transforming its computing systems to make near instantaneous decisions based on real-time customer and industry data – enabling clients to move from being reactive to proactive and predictive. A2E also helps clients market financial offerings to their customer base in a way that is more productive and helpful, moving banking customers from "Awareness" of a need for a product to "Execution" or purchase of the product rapidly at the speed of markets measured by the financial, risk and compliance management success from the Customer and up through every level of management.

7.      Before he rejoined IBM, Plaintiff used his A2E methodology pursuant to a Non-Disclosure Agreement ("NDA") to develop an entirely new system for JP Morgan Mobile Strategy, which demonstrated the value of his trade secrets to the banking and financial services

industry, leading to the largest sale by two-fold in mobile security history at the time.  In addition to the JP Morgan engagement, Hayden used A2E on behalf of a number of other large financial services clients prior to returning to IBM in November 2015.  Each of these engagements were pursuant to NDA's that protected Plaintiff's A2E trade secrets.  From 2009 to 2016, Hayden utilized A2E to gain a competitive advantage over others as a consultant in the financial services arena.  A2E enabled Hayden to stand out from other consultants in the financial services field.

8.      In November 2015, 6 years after he had developed A2E, Plaintiff Hayden rejoined IBM to become a member of their Global Business Solutions ("GBS") team.  Essentially, Plaintiff was to act as a high-level consultant for IBM's banking customers – and potential customers – helping them move their businesses into the 21st Century.

9.      At the start of his tenure at IBM, Plaintiff Hayden was required to engage in several days of training on IBM policies and procedures. During this training, he and the other trainees were told that IBM was committed to protecting trade secrets of third parties including its own employees and that it had developed strong procedures to achieve this.  Employees were told that these policies and procedures were part of their employment agreement, including IBM's commitment to making the protection of trade secrets paramount, and that any IBM employee caught using another employee's trade secrets could be terminated.  Plaintiff was also told that he should disclose generally any trade secret or other intellectual property that he had developed prior to coming to IBM, and that IBM would protect it and ensure that no other employee would use it without his permission.

10.     Plaintiff was given, during this training session, an agreement that he was directed to sign as a condition of his employment. This agreement included a specific section where Plaintiff could list any pre-existing intellectual property or trade secrets.  Plaintiff was told that

IBM could use any such pre-existing intellectual property or trade secrets only with Plaintiff's express permission.  In that section of the agreement, Plaintiff Hayden listed "A2E" and "EERT" as pre-existing intellectual property that was his own and which IBM could only use with his express permission.

11.     Prior to completing the agreement concerning the protection of his trade secrets and intellectual property, Plaintiff requested and received the guidance of one of the IBM Human Resources professionals conducting the training as to how to correctly fill out the agreement. Plaintiff completed and executed the form exactly as instructed by IBM.

12.     This agreement confirmed what IBM told Plaintiff during the training.  During the new employee orientation, new employees learned about IBM's code of ethics, as well as IBM's practice of protecting any pre-existing employee intellectual property that was developed prior to the employee joining IBM and without the use of IBM resources. During this training, Plaintiff Hayden was told that if he used trade secrets during his employment on his assignments, IBM would protect them with non-disclosure agreements and that no one would be allowed to use those trade secrets without his permission.

13.     Reasonably believing that his A2E trade secret was protected both by his employment agreement with IBM and by IBM's policies and procedures, as well as IBM's code of ethics, Plaintiff Hayden got to work.  Specifically, his task was to seek out and obtain new banking clients for IBM's GBS team.

14.     To that end, and operating under the protections of his employment agreement and the IBM code of ethics and relying on what IBM had told him, Plaintiff Hayden presented his A2E business methodology with IBM's approval to a set of high level IBM executives, including Defendants Ramamurthy and Suarez, as well as the Global Head of Strategy for IBM

Banking and Financial Markets at IBM, Anthony Lipp; Gerald Hopkins, a leader in Integrated

Risk Management at IBM and Promontory; Bill Fuessler, a partner in IBM Global Services;

Vice-President for Cognitive and Data Analytics at IBM, Thomas Torf; Michael Henry,

Executive Consultant, Strategic Consulting, IBM Analytics; Brian Murrow, the Managing

Partner of IBM's North America Financial Services Sector Risk & Compliance Advisory; and

Kwafo Ofori-Boateng, IBM's Global Director of Front-Office Transformation Solutions, among

many others.

     15.    In his meetings with these and other IBM executives, Plaintiff proposed that the

use of his trade secrets to create IBM products for the banking and financial services industry

could be of tremendous value to IBM.  During these presentations, Plaintiff made clear that this

was his proprietary trade secret material which he had developed prior to coming to IBM, but

that he was presenting it so that IBM senior staff could see A2E's value and business use, and

support him in his efforts to promote A2E with potential IBM banking clients for the mutual

benefit of IBM and Plaintiff.

     16.    Specifically, if Plaintiff successfully landed a new banking customer for IBM

using A2E in his pitch, then IBM would benefit by way of increased revenues and Plaintiff

would benefit by way of substantial performance bonuses and licensing fees. Plaintiff Hayden's

A2E would be protected by NDAs and its value preserved, as well as generating licensing fees

for A2E.

     17.    Plaintiff Hayden, however, did not realize he was swimming with sharks.  Shortly

after he began meeting with several large banking customers and receiving positive feedback

from those customers regarding A2E, IBM began receiving new contracts worth tens of millions

of dollars. IBM executives immediately began to systematically cut Plaintiff Hayden out of the

contracts he initiated, and steal A2E for their own benefit. This was accomplished by shifting all A2E sales and development away from Plaintiff and Plaintiff's GBS division to the Individual Defendants' competing divisions and/or areas. For example, the Watson Intelligence Division was supervised by Defendant Ramamurthy, who was responsible for the Watson Platform Strategy which did not exist. These other areas within IBM, seeing A2E's value, incorporated these trade secrets into their own projects, and then pursued IBM customers – all without Plaintiff's involvement. Such gross misconduct demonstrates IBM's recognition of the tremendous value of Hayden's A2E intellectual property, and at the same time is reflective of the craven, unethical and self-serving behavior of IBM's most senior executives to try to dramatically enhance their own division's revenues, and thus their own performance bonuses, while also helping IBM break out of its competitive disadvantage with Amazon, Google, and Microsoft. Thus, in a concerted effort which reached the highest levels of the Company, IBM simultaneously stripped Plaintiff of the value of his intellectual property, his client base (that included several of the largest banks in the world), and either moved those clients over from Plaintiff to other areas including but not limited to the Watson Division, IBM Promontory, Hybrid Cloud, Cloud for Financial Services, Salesforce, Cognitive Enterprise and others, or blocked Plaintiff from participating in his engagements and deprived him of any credit. IBM thus used A2E's value proposition to drive IBM's claimed reinvention of itself as a leader in the hybrid cloud computing industry and as an invaluable consultant to the financial services industry.

18.     To further protect and hide the theft from Plaintiff, IBM Management stopped inviting Plaintiff to meetings of IBM's Risk Committee and IBM's Financial Services Patent Committee, where he served as a member and where discussions on new initiatives and patents

would be discussed.  IBM (unknown to Plaintiff ) began forwarding all internal correspondence to and from Plaintiff to the IBM Middle East Head of Financial Services located in the United Arab Emirates.

19.     To add insult to injury, after stealing Plaintiff Hayden's proprietary A2E business methodology and stripping him of his client base, IBM shortly thereafter terminated Plaintiff for "lack of work."  It is hardly surprising, however, that Plaintiff Hayden had nothing to do, given that he had no clients left after IBM's theft of his trade secrets and client base.

20.     Shortly after terminating Plaintiff Hayden, IBM used his trade secret A2E as the engine to reorganize the entire company to capitalize on the competitive advantages it obtained from A2E. Among other things, this included securing contracts from major banks, acquiring Red Hat to provide IBM's cloud computing infrastructure necessary for A2E to function, entering into partnerships with Fenergo, and reorganizing Watson and Promontory to focus on creating software that used A2E methods to drive IBM's Hybrid Cloud business, the new IBM Cloud Pack 4 Data, the new Business Process Platform and other technologies.

21.     Perhaps most importantly, soon after IBM fired Plaintiff Hayden, to build its new brand as the invaluable consultant that would revolutionize the financial services industry, IBM intentionally released portions of A2E in the marketplace through white papers, public presentations to IBM Partners, the press, and trade groups, and widely marketed A2E to its global customer base, all of which disclosed crucial aspects of Plaintiff Hayden's A2E intellectual property.  The purpose of this was twofold – first, to undermine the validity of Plaintiff's intellectual property claims.  Second, by giving away Plaintiff's A2E methodology it would drive new business and new revenue to IBM's hybrid cloud computing model, IBM Promontory, Watson, IBM Cognitive Enterprise, Salesforce, the new IBM Cloud Pack for Data,

and the new IBM Business Process Platform.  In essence, IBM could sell new software, analytics and/or other technologies to each customer – tailored to a customer's specific operations, IT infrastructure and goals using the A2E methodology – and, more importantly, sell more data processing and hybrid cloud computing services that generate enormous revenue for IBM based on the amounts of data processed for each customer, which would increase enormously to fulfil A2E functionality.  Indeed, shortly after being terminated by IBM, Plaintiff learned from others in the industry who were familiar with his A2E methodology that they recognized his trade secrets in public documents being circulated on LinkedIn.  Plaintiff immediately wrote an email protesting the use of his intellectual property to senior IBM executives and demanding they cease and desist.  However, IBM ignored these demands and those of other IBM employees who saw what was happening and instead fired anyone who complained about the IP theft.

22.     IBM's strategy was as simple as it was devious: put in the public space principles of A2E to entice financial industry customers into seeking out IBM's help in incorporating this revolutionary system into their own businesses.  To facilitate new customers' use of A2E, IBM acquired open-source tech company Red Hat.  By partnering with Red Hat, IBM would have the ability to link the private clouds of various competing banking customers and other vendors together so as to allow for the real-time exchange of customer data and enhanced near instantaneous decision-making for bank treasury departments and every level of bank management up through and including real time Board of Directors risk management, while optimizing the sale of various financial products to the public at large.  The Red Hat acquisition had everything to do with taking Plaintiff's A2E methodology and promoting it on a large scale.

23.     IBM has taken A2E and refocused its entire Watson operation – indeed the operations of the entire company – on its promotion and implementation within the financial

sector as well as other industries.  IBM has already made and stands to make many billions on the back of Plaintiff Hayden's A2E trade secret – which IBM had agreed by both contract and through its policies and procedures and ethics code to protect and not use without Plaintiff Hayden's express consent.

24.     In a transparent attempt to conceal its theft and proof of its guilty knowledge, IBM has made deals with companies such as Red Hat and Fenergo, Salesforce and many other vendors claiming that those companies, rather than Hayden, had developed these proprietary trade secrets even though Plaintiff Hayden can demonstrate that he created A2E years earlier.

25.     Plaintiff has been damaged not just by the wrongful termination of his employment, the stripping of his client base, and the loss of substantial performance bonuses and licensing fees based on his use of A2E for IBM customers, but also through the value that A2E's theft has brought to IBM (a value that he should have shared in as an IBM employee and the owner of A2E).  IBM has stolen a trade secret worth billions of dollars, and left Plaintiff and his colleagues without employment and possessing intellectual property which has been widely disseminated and rendered essentially valueless.

26.     Plaintiff Hayden has been left with a worthless product to sell.  IBM took A2E – Plaintiff Hayden's closely guarded trade secret – and simply gave it away to the masses.  Even if Plaintiff Hayden wanted to take his A2E trade secret and sell it to one of IBM's competitors, he couldn't because IBM not only divulged the methodology for the world to see, but also directly and indirectly gave the IP to competing consulting firms such as Deloitte and Accenture through common Partners such as ServiceNow, Salesforce and many others.

27.     Plaintiff Hayden will be able to demonstrate to the Court a clear timeline – his creation of A2E pre-employment, his protection of A2E in his IBM employment agreement and

through IBM's policies and procedures and code of ethics, his protected and conditional limited disclosure of A2E to a set of senior-level staff at IBM with the caveat that this was proprietary material created prior to his employment with IBM and which Plaintiff Hayden had ownership of, IBM stripping Plaintiffs' clients and the turnover of same to various IBM divisions, Plaintiff's termination and, finally, IBM's public promotion of A2E as the "next big thing" that would drive IBM's revenues for the foreseeable future.

28. As a result of IBM's theft of trade secrets, breach of contract, wrongful termination and related illegal acts, Plaintiff Hayden has been harmed in an amount to be determined at trial, but which is initially valued as being well in excess of billions of dollars.

## II.    PARTIES

### A.    Plaintiff

29. Gerald Hayden is a financial services consultant; he worked for IBM as a Chief Digital Officer in IBM Global Business Services. Hayden resides in Connecticut.

### B.    Defendants

30. IBM is a multinational technology and consulting company headquartered in Armonk, New York with more than 350,000 employees serving clients in 170 countries. IBM markets and sells the products that are the subject of this litigation across the world and in interstate commerce throughout the United States.

31. Pablo Suarez is Vice President and Global Leader of Financial Service Sector Centers of Competence and Digital Banking at IBM.  On information and belief, Defendant Suarez is domiciled in Canada.

32. Shanker Ramamurthy is Global Managing Partner for Banking.  He was also General Manager and one of IBM's most senior level executives and was responsible for IBM Watson Platform Strategy. On information and belief, Defendant Ramamurthy is domiciled in

11

New York City.

## III.   JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over Plaintiff's claims.  The United

States District Courts have exclusive jurisdiction over actions brought under the Defend Trade

Secrets Act pursuant to 18 U.S.C. § 1836(c) and otherwise have jurisdiction over federal

statutory causes of action under 28 U.S.C. § 1331.

34.     This Court has supplemental jurisdiction over Plaintiff's state and common law

claims pursuant to 28 U.S.C. § 1367.

35.     Pursuant to 28 U.S.C. § 1391, venue is proper in this judicial district because

Defendants IBM and Ramamurthy reside in the Southern District of New York, a substantial part

of the events and omissions giving rise to the claim occurred in the Southern District of New

York, and because Defendant IBM, the mastermind of the schemes alleged here, transacts

business within the Southern District of New York and is headquartered here.

36.     All Defendants are subject to the general and specific jurisdiction of this Court.

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     Hayden's Development of A2E

37.     A2E is an advanced business decision making methodology that takes separate

and serial workflows from across an organization's (or many organizations') numerous, siloed

departments or divisions, and makes them integrated, simultaneous and real-time customer-level

executable; it is essentially a process for reorganizing and restructuring business operations and,

although conceived with a focus on banking and the delivery of financial services, is applicable

to any business or industry.  EERT is a derivative of A2E; EERT is a measurement tool, used to

measure the efficacy and efficiencies achieved using the A2E methodology.  A2E sets forth a

process to integrate the workflows, and the technologies, data, applications, and related systems that these separate and serial workflows depend upon.

38.     Hayden developed A2E throughout the course of his career in banking and technology.  He created A2E by drawing from his experience in all sectors of banking (e.g. operations, finance, marketing, and information technology) at Shawmut Bank, his early consulting and software applications experience at IBM, his work as Vice President and Head of the Financial Products Group at MetLife, his work as a Global Financial Services Principal and most senior Banker at Cisco Systems, and as Head of Global Financial Services at the largest Mobile Security Company in the world Good Technology (now Blackberry) and his training and experience in Six Sigma.

39.     By August 2009, A2E was fully developed, and Hayden drew from it regularly in his trade as a financial services and information systems consultant; without selling, sharing or revealing its essential concepts, Hayden used A2E to conduct his trade as a consultant on a routine basis.

40.     In 2014, Hayden incorporated his A2E methodology into a series of confidential white papers that were for Customer internal use only and protected by NDA's.

41.     The first white paper, written in July, 2014, entitled "Treasury Management Mobile Connect, a Benchmark Case Study Training on Achieving and Maintaining Mobile ROI and Competitive Differentiation in Digitization Strategy," outlines in detail the essential components of A2E, including moving siloed business practices into integrated workflows in a customer-centric manner, structuring operations along a continuum from "Awareness" to "Execution" in as close to real time as possible, to meet the demand of the speed of markets, to manage aspects of the bank's balance sheet (including real time risk and compliance

management) closer to real time, and to achieve mutual economic benefits for the company and its customers.  This white paper also explains EERT measurement principles to ascertain whether efficiency was maximized using the lowest cost structure; whether effectiveness was achieved in terms of mutual financial benefits; and whether integrated workflows are operating in real time.

42.     The second white paper, written in August, 2014 and entitled "The WHAT, WHY and HOW of Digital Marketplaces (and FinTech) Including Core Competency Requirements Business Principles, and IT Architectures," discusses the same key concepts in relation to financial marketplaces.  Its use was restricted to customers only and was also protected by NDA's.

43.     In November 2015, more than a year after Hayden wrote his A2E white papers, he rejoined IBM as a consultant in the GBS Division.  Unlike his prior employers, which sold Network Technology and Mobile Security, IBM dealt in the Application Layer, where Hayden had the potential to generate substantial licensing fees from his A2E trade secrets and IP.

**B.     IBM's Onboarding Process and Employee Orientation.**

44.     New hires at IBM are required to attend an extensive three-day orientation which involves training in IBM's internal technology, practices, procedures, guidelines and code of ethics.

45.     Hayden attended his on-boarding orientation in November 2015.

**i.  IBM Confidential IP Agreement**

46.     On November 2, 2015, as a condition of employment, Hayden signed a confidentiality agreement with IBM, entitled "Agreement Regarding Confidential Information, Intellectual Property, and Other Matters" ("Confidential IP Agreement").  This Confidential IP Agreement explicitly identified and reserved Hayden's right, title, and interest in certain

intellectual property previously made or conceived of by Hayden that he was not assigning to IBM upon employment, namely A2E, EERT and any related material.

47.     During the three-day employee orientation, IBM assured Plaintiff that his intellectual property would be protected pursuant to his Confidential IP Agreement and IBM's policies and practices, denominated IBM Business Conduct Guidelines, which establish rules governing the protection of intellectual property and confidential information within IBM.

48.     Plaintiff was told during the onboarding orientation that the protection of intellectual property was a paramount concern at IBM; that IBM's practices were intended to protect the trade secrets of third parties including its own employees, and that an IBM employee caught using a third party's trade secret was subject to severe discipline and likely termination.

49.     Plaintiff was told that, in order to protect his intellectual property or trade secrets from unauthorized use or disclosure by other IBM employees, he should identify all written materials reflecting such IP or trade secrets as "Confidential," which Plaintiff did.

50.     In particular, Plaintiff was told that no one at IBM could use his A2E intellectual property without his express authorization. Hayden was also told that if anyone used A2E in any work for IBM he was entitled to be involved in the transaction and receive credit for it, and that Hayden was authorized to use A2E in work he performed for IBM.

### ii.  IBM Business Conduct Guidelines – a Code of Ethics

51.     IBM has developed a code of ethics denominated "Business Conduct Guidelines" ("BCGs") designed "to provide general guidance for resolving a variety of legal and ethical issues."  The BCGs are supposed to be grounded in IBM's basic values, particularly "IBMers' core Value of Trust and personal responsibility in all relationships."

52.     The BCG's emphasize that IBM and its employees are expected to "Respect Intellectual Property Rights."

53.     In addition, the BCG's specifically refer to and reinforce IBM's employment agreement, including its provisions "relating to intellectual property."

### iii.     Collaboration Rules and Credit at IBM

54.     According to the BCG's, IBMers are supposed to collaborate and draw from one another's knowledge and experience. IBMers are encouraged to work together across divisions and disciplines to maximize the expertise and delivery of high-quality products and services marketed to IBM's clientele.

55.     When IBMers collaborate, they are supposed to include each other in communications and to give credits for individual contributions.

56.     In particular, IBM employees are entitled to bonuses based on a percentage of the economic value to IBM of deals for which they were responsible.

### C. Hayden Relies on his IP Agreement with IBM, IBM's Business Conduct Guidelines, and IBM's Representations to Share His A2E IP with IBM Employees, but Defendants Exclude Plaintiff from the Resulting Engagements and Bonuses

57.     Relying on the provisions of the IBM Confidential IP Agreement, IBM's Business Conduct Guidelines, the representations made to him during the onboarding orientation, and IBM's internal business practices, Hayden began to share his A2E methodology and concepts with others at IBM.

58.     For example, Plaintiff presented his IP to over fifty IBM Executives to align them and gain funding, as well as to stop IBM Divisions from competing against each other, transitioning internal IBM Department Verticals into a single Horizontal integrated effort (an A2E initiative).

16

59.     Hayden also prepared a master slide presentation incorporating A2E to develop new business for IBM's GBS. The IBM version of the slide deck was generated by Hayden in December 2015, shortly after his return to IBM, and was virtually identical to the original form of the A2E PowerPoint that Plaintiff developed in 2009.  Hayden's master slide presentation, which formed the core of his presentation to each IBM executive, clearly indicated that the material contained therein was confidential and proprietary, and Hayden emphasized this at each such presentation.  In addition, Hayden made sure to inform all present that he had developed these trade secrets over his career, and zealously protected them from being disseminated or copied without his permission.

60.     Plaintiff also incorporated his A2E in presentations for potential clients, including National Australia Bank (Melbourne), DBS Bank Ltd. (Singapore), Fifth Third Bank (Cincinnati), Ocean Bank (Miami), Mizuho Financial Group (Tokyo), Banco Bilbao Vizcaya Argentaria (BBVA), First Rank Bank (South Africa), Equifax, and Asian Infrastructure Investment Bank, among others. In each of these presentations, Hayden relied on his master slide presentation and again clearly emphasized that the material contained therein was confidential and proprietary to Hayden. Such presentations were made pursuant to written non-disclosure agreements.

61.     In addition, Plaintiff wrote another confidential white paper, called "Future Financial Performance in Banking" in November of 2017, incorporating and applying the A2E trade secrets reflected in his earlier white papers – written before his return to IBM – and the A2E PowerPoint developed in 2009.  This document was sent only to Customers under NDA's and only for their exclusive use.

62.     Working closely with several IBM colleagues, Plaintiff pursued business from these and other leading financial institutions utilizing his A2E methodology.   Among the colleagues with whom Hayden worked closely in pursuing this business were Steven Cohen, Daniel Gottlieb, and Daniel Bingham.

63.     Plaintiff and his colleagues also worked closely with AML Partners LLC ("AML Partners").   AML Partners is a Behavioral Risk software-development and consulting firm that specializes in helping banking and financial services clients identify customers involved in money laundering and other illegal activities.

### i.  National Australia Bank (Melbourne)

64.      Plaintiff's first engagement after returning to IBM was National Australia Bank ("NAB").   NAB is a Global 20 bank.

65.     Hayden returned to IBM in November 2015.  Within a few months, Hayden had won a deal with NAB worth $40 to $50 million.  Plaintiff's annual sales quota with IBM was only $4 million.  Plaintiff had completed 10 years worth of annual sales quotas in a few months with his A2E IP.

66.     This was IBM's first strategic engagement with NAB in over 5 years.

67.     Thus, Hayden was given an essentially "blank slate" and was simply told to go in and get an engagement.

68.     Plaintiff traveled to Australia where he met with 70 to 80 NAB executives.

69.     After collecting NAB's strategy needs and defining weaknesses or obstacles, Plaintiff presented his findings to NAB's CIO and Head of Data Strategy.  The Head of Data Strategy told Plaintiff: "No consulting firm has ever been able to explain this to us this way; we are going with IBM."

70.     NAB immediately chose to pursue a deal with IBM, terminating discussions with IBM's main competitors in the consulting space, Accenture and McKinsey, both of which have significantly greater market share than IBM's GBS Consulting.

71.     The presentation that Hayden gave to NAB's CIO and Head of Data Strategy reflected and incorporated A2E.  Many of the slides in Plaintiff's presentation came directly from the A2E master deck.

72.     Hayden presented these trade secret concepts to NAB pursuant to an NDA.

73.     Even though it was beyond the original scope of his assignment, Plaintiff also developed a 22 page list of written recommendations for NAB.  Plaintiff was told by NAB's Head of Data Strategy: "We are adopting every recommendation." This would lead to a second phase of the engagement and increase IBM's revenues.

74.     Once Hayden had completed his Phase 1 assignment for NAB, he started compiling a list for the IBM Sales Team on next sales events after the Phase 1 deliverables were finished.

75.     However, the IBM Australian Team cut Plaintiff out of the Phase 1 deliverables thereby coopting Hayden's potential bonuses and to B&P Code funding for themselves. B&P Code is an internal transfer of monies within IBM.

76.     The IBM Australian Team did not understand A2E and the required Data Architectures.  As a result, they botched the implementation of the deal that Plaintiff had won for IBM.

77.     Plaintiff never received his bonus for the NAB engagement or the appropriate months to years worth of B&P Code funding to build out the A2E Platform and set up to receive licensing fees from IBM.

78.     In addition, on information and belief, the IBM Australian Team, as well as others such as Defendant Suarez, took Plaintiff's A2E trade secret and disclosed it to third parties including to WestPac, another Australian bank, after Hayden had been terminated.

**ii.     DBS Bank Ltd. (Singapore)**

79.     DBS Bank Ltd. is one of the largest banks in Singapore.  As was the case with NAB, IBM had not had a strategic engagement with DBS in 5 years.  Plaintiff was told by IBM's Singapore Partner that IBM had lost $50 million in annual revenues with DBS because IBM was not meeting DBS' needs.

80.     In August 2016, Hayden presented to the entire CFO staff of DBS pursuant to an NDA.  Plaintiff's presentation was based on and incorporated his A2E.

81.     Immediately after Plaintiff's presentation, Hayden was approached by the CFO of DBS who handed Plaintiff her business card and asked Plaintiff to interview all of her direct reports.

82.     As requested, Plaintiff conducted the interviews over the course of the afternoon. Based on a single afternoon of interviews, Plaintiff developed 48 major business requirements and technology output deliverables.

83.     Plaintiff was not permitted to engage with the client on implementation of next steps because, if he did, the revenue would go to the United States rather than IBM's local team in Asia.  Thus, Hayden would be due bonuses that the IBM Singapore Partner (who neither contributed nor attended any meetings with CFO Staff to secure the engagement) would now not receive.

### iii.    OP Bank (Helsinki)

84.    Plaintiff and his colleague Daniel Bingham worked directly with the CFO and incoming CEO of OP Bank, one of the largest financial companies in Finland.

85.    On the OP Bank engagement, Plaintiff and Bingham worked with MORS Software, a leading global provider of integrated Treasury solutions.  MORS offered a real-time balance sheet management platform solution that IBM did not have available.  Two things the MORS Software lacked, however, were KYC Regulatory mandated architectures and Customer Centric financial data.  Hayden and Bingham fixed for these issues for MORS to make it a viable interface to A2E Platform Architecture.

86.    Plaintiff spent hours teaching A2E to the IBM Europe architects in connection with the OP Bank opportunity.

87.    Plaintiff also spent time with Keith Bear, one of the most senior executives in IBM Europe, instructing him on A2E to gain IBM European alignment.

88.    Both MORS and the IBM Sales Team were "98%" confident that IBM would close the first $50 million deal with OP Bank that could lead to an eventual total sale of over $2 billion U.S. Dollars.

89.    At the eleventh hour, IBM Helsinki decided to bring OP Bank to one of its "Watson Days" events.

90.    Despite protests from Plaintiff and Bingham, IBM opened up a new "Watson" approach with OP Bank, directly competing with Plaintiff and his team.

91.    As a result Hayden lost the OP Bank deal.

92.    Soon afterwards, the IBM European Team began posting Plaintiff's intellectual property in Finnish on the Internet.

93.     The IBM GBS Partner saw the content and sent it to Plaintiff with a note asking, in essence, "Isn't this your stuff?"  Although the post was later deleted, after a formal complaint lodged with Defendant Suarez against the IBM Nordic employees by Bingham, Cohen and Hayden, Plaintiff's intellectual property had already been divulged to the public. Defendant Suarez advised Plaintiff this was a very serious charge and that the IBM employees would likely be terminated.  In response, Hayden advised Defendant Suarez in writing he did not want anyone fired, he wanted them to stop using the A2E IP without his involvement and for him to receive proper credit.

**iv.     JP Morgan Chase**

94.     IBM knew of Plaintiff's extensive relationships at J.P. Morgan Chase and that he had closed the JPMC Mobile Strategy deal for Good Technology.

95.     Bill Fuessler, the former Global Banking & Financial Markets Leader, North America, was IBM's Client Executive for the JPMC account.  Plaintiff provided Fuessler a three hour presentation based on his A2E.  At the completion of the presentation, Fuessler told Plaintiff:  "You're answering every question that JPMC has."  Fuessler also told Plaintiff:  "We need to get you in front of Bridget van Kralingen."  Van Kralingen was the second ranking IBM executive and reported directly to the then-CEO and Chair of IBM, Virginia Rometty.  Fuessler then called a meeting with Defendants Suarez and Ramamurthy, Bingham, Cohen and Hayden who requested that Defendants Suarez and Ramamurthy fund the A2E Practice and Solution, which Defendants Suarez and Ramamurthy declined, as it became apparent soon afterwards, that Defendants Suarez and Ramamurthy had conspired to steal the A2E IP and call it their own.

96.     Moreover, Plaintiff was forbidden by his boss, Defendant Suarez, from approaching JPMC.

97.     In addition, Defendant Ramamurthy ordered William Fuessler and Anthony Lipp to stop engaging with Hayden or Bingham.

98.     Shortly thereafter, the CEO of JPMC sent a letter to Rometty advising her that IBM had been removed from JPMC's Preferred Vendor List after more than 25 years of IBM being on the list.

### v.     Ocean Bank (Miami)

99.     Ocean Bank is the second biggest retail bank in Florida.  IBM successfully closed this deal due to the efforts of Hayden and Daniel Gottlieb and Bingham.  However, IBM denied credit for the Ocean Bank deal to GBS and instead awarded it to the Watson Group, then supervised by Defendant Ramamurthy.

100.    On information and belief, the Global Managing Director for Banking and Financial Markets Sarah Diamond (a former Watson General Manager) directed that Watson receive credit for the deal.

### vi.     Mizuho Financial Group (Tokyo)

101.    Mizuho is one of the largest banks in Japan.  In early 2018, Mizuho transmitted a Request for Information ("RFI") to IBM.  The engagement was spearheaded by Michael Henry of IBM's Global Services.

102.    Plaintiff spent Easter Weekend 2018 writing a platform strategy as a direct response to the specific requests in the Mizuho RFI.

103.    However, Michael Henry was under pressure from more senior IBM executives to sell Watson.  On information and belief, this pressure came from, among others, Sarah Diamond.

104.    The platform presentation developed by Plaintiff was never submitted to Mizuho.

105.     Instead, Defendant Suarez directed Kwafo Ofori-Boateng to build Hayden's A2E IP into an IBM Business Process Management ("BPM") Solution that Ofori-Boateng presented to Mizhuo.  Defendant Suarez had previously directed Plaintiff to meet with Ofori-Boateng to instruct him concerning A2E.

106.     Using the information developed by Plaintiff, including Plaintiff's A2E trade secret, Ofori-Boateng, together with Sarah Diamond and IBM CEO and Chairperson Virginia Rometty, met with Mizuho executives in Tokyo, Japan.

107.     Plaintiff and his team were excluded.

108.     Also excluded was AML Partners.  Plaintiff and his team had identified AML Partners as offering the best solution to the needs identified in the Mizhuo RFI.

109.     Plaintiff had worked with AML Partners to prepare a platform to be presented to Mizhuo.  However, shortly before the presentation, IBM executives Michael Henry and Brian Murrow substituted Watson Financial Crimes and Compliance Group for AML Partners, even though IBM did not have the proper Platform Solution, and excluded Plaintiff from any further involvement while they pitched the Mizhuo deal using A2E concepts and methodology.

110.     AML Partners had been dropped from the Mizhuo engagement after Sam Kalyanam, Global Business Head of Watson Financial Crimes and Compliance Group and a subordinate of Defendant Ramamurthy, wrote a multi-page e-mail proposing using Fenergo, a direct competitor of AML Partners.

111.     Kalyanam previously had served on Fenergo's Growth Advisory Board immediately prior to being recruited to Watson by Defendant Ramamurthy.

24

### vii.    Banco Bilbao Vizcaya Argentaria (BBVA)

112.    BBVA is a multinational financial services company based in Madrid and Bilbao. It was one of IBM's first customers on the A2E IP model.

113.    In January 2018, Defendant Suarez told Plaintiff that Hayden would be heading up the BBVA engagement, working with the IBM Spanish team, and using A2E.

114.    Plaintiff prepared extensively for the BBVA engagement, preparing a detailed presentation incorporating his A2E trade secrets and based on BBVA corporate objectives.

115.    After Plaintiff had presented all his research to the Spanish Team in January 2018, Defendant Suarez told Plaintiff that "there had been a change of plans," and that Plaintiff would neither be leading the BBVA engagement nor participating in it.

### viii.    Rand Merchant Bank

116.    Rand Merchant Bank ("RMB") is the corporate and investment division of FirstRand Bank, one of the largest financial institutions in South Africa.

117.    In April 2018 Plaintiff received a call from the RMB Account Manager at IBM asking Plaintiff to speak with RMB's CIO.  Based on Hayden's review of RMB's Strategies, Plaintiff proposed an agenda.

118.    Plaintiff prepared a slide deck using his A2E and shared it with the Account Manager prior to presenting it to the CIO of RMB.  According to the IBM Account Manager, this led to the fastest approval of B&P Code for Hayden's presentation that he had ever witnessed.

119.    Immediately after presenting the slide deck to the RMB CIO, the CIO asked Plaintiff to come to South Africa to present to his Board of Directors.

120.    Plaintiff informed the IBM Account Manager and Defendant Suarez of these developments.

121.    At this point Plaintiff was cut out of the RMB engagement, and Defendants Suarez and Ramamurthy took a sudden trip to South Africa to meet with RMB.

122.    When Plaintiff called the IBM Account Manager to follow up, his calls were not returned.

**ix.    Equifax**

123.    Equifax Inc. is one of the largest consumer credit reporting agencies in the United States.

124.    On behalf of IBM, Plaintiff had been pursuing an engagement with Equifax that contemplated optimizing Equifax's systems using a platform organized according to A2E Platform principles.  Upon Hayden presenting the A2E Platform Strategy to the head of Equifax Corporate Strategy, Equifax purchased $95 million dollars in Computing Services and they revamped portions of their corporate strategy based on A2E principles.

125.    Plaintiff and Bingham had been working on the Equifax engagement for several months when Thomas Torf, the Global Leader for Cognitive Analytics, Enterprise Applications at IBM, wanted to get involved.  Torf was a member of GBS and his role was to coordinate activities between GBS and Watson.  Torf was hired by Defendant Ramamurthy.

126.    Based on Torf's role, Plaintiff and Bingham met with Torf for two days in Chicago to teach him the A2E methodology to align the GBS and Watson Divisions and incorporate Watson into the A2E platform design.

127.   At this time, IBM was partnering with AML Partners to build reference architectures for Equifax and to solidify the Partnership and Architectures between Equifax and AML Partners.

128.   ALM Partners, together with Plaintiff and his team, was scheduled to meet with Equifax on May 21 and 22, 2018.  The purpose of the meeting was to identify the Equifax Credit Bureau data elements that could be used in Customer-Centric Risk Management according to A2E principles and within the AML Partners' Platform, as the IBM Manager declined to fund it.

129.   Torf wanted to participate in the meeting, and he was permitted to do so.

130.   Plaintiff and Bingham, together with key Equifax executives and AML Partners, had spent two weeks developing the agenda for the meeting.

131.   Torf had been given an opportunity to provide input into the agenda, but did not do so.

132.   On the second day of meetings, Torf barred AML Partners from the meeting on the pretext that AML Partners did not have a NDA with IBM.  This was not true, as Torf was informed. A meeting was held with Torf with Plaintiff, Bingham, and the CEO of AML Partners. In fact Hayden confirmed the NDA between IBM and AML Partners was signed nine months prior.

133.   Torf proceeded to have AML Partners kicked out of their own Equifax Partner Meeting, claiming he was the highest ranking IBM Employee and could do so - and knowingly lied to Equifax Executives.  Torf later privately and secretly met with Equifax, taking both AML Partners Data Strategy and the A2E IP the whole project was based on, and told Jeff Schwartzel, the Head of Equifax Partnerships, that GBS would not be involved and only Watson would be

working with them. Defendant Ramamurthy managed the Watson Platform Strategy Group, and cut out GBS and the Plaintiff.

134.    Ultimately, Equifax entered into a partnership with IBM.  Nevertheless, Plaintiff and his colleagues Bingham and Cohen were excluded from these negotiations and denied credit for the transaction even though A2E was used by Torf and IBM as a driver to achieve this partnership with Equifax.

> **x.      Asian Infrastructure Investment Bank**

135.    The Asian Infrastructure Investment Bank ("AIIB") was formed by the People's Republic of China and currently has over 100 member states around the world.  The AIIB is seen as a potential rival to the World Bank and the International Monetary Fund.

136.    Plaintiff was working directly with the chairperson, CEO, and the other most senior executives at AIIB and developed first phase deliverables based on Plaintiff's A2E.

137.    Nonetheless, Defendant Suarez gave the project to another IBM employee, Juan Powell, and excluded Plaintiff from the engagement when it came down to specifics for a Commercial Loan System Platform for a Development Bank.

138.    Prior to the engagement's reassignment to Powell, Plaintiff had documented the AIIB deliverables, reflecting Plaintiff's A2E.  Defendant Suarez turned them over to Powell.

139.    Plaintiff received no credit for his work on the Development Bank Loan System requirements for the AIIB project.  Instead, Powell did.

> **xi.     FifthThird Bank (Cincinnati)**

140.    Based on the reputation Plaintiff had developing within IBM for the value of his A2E trade secrets, Plaintiff received a call from the GBS lead for Fifth Third Bank, who wanted Hayden to meet with the Bank's senior level executives.  Plaintiff agreed to do so.

141.    After meeting with the Fifth Third executives, Plaintiff was asked to produce a Memorandum of Understanding ("MOU") defining deliverables and requirements.    As requested, Plaintiff prepared an MOU providing an overview of how IBM would address the Bank's needs.

142.    The IBM account manager for Fifth Third informed Plaintiff after the fact that a competitor, TATA, had already been awarded the Technology development part of the engagement.

143.    This meant that, if IBM won the Consulting lead, Plaintiff would have to give his A2E IP to a competitor.

144.    In order to protect his IP, Plaintiff did not follow up on the potential engagement.

145.    When Plaintiff told his boss, Defendant Suarez, Suarez became angry and told Plaintiff that he should have pursued the deal anyway.

**D.    IBM Wrongfully Terminates Plaintiff.**

146.    In July 2018, Defendant Suarez told Plaintiff that things were not "working out" at GBS, and that Plaintiff would need to look for employment within another division at IBM or he would have to be terminated.

147.    On July 22, 2018, Defendant Suarez called Plaintiff and stated that Plaintiff's position was being eliminated.  Defendant Suarez also indicated he would be having the same conversation with Steven Cohen, the new Partner who would be heading up the A2E Platform practice.  Cohen also filed a written request for the need for advice to the Head of IBM HR Diane Gherson, as well as the Head of the IBM Ethics Committee, on the subject of stolen A2E IP and other unlawful conduct within the Company.

148.    When Plaintiff was unable to find another position elsewhere within IBM, he was terminated in October 2018.

149.     Plaintiff was falsely told by Defendants that his position was being eliminated because "there was not enough work."

150.     On the contrary, the CEO of AML Partners told Plaintiff there was enough work to keep him fully engaged for at least the next year on the Ocean Bank deal alone.

151.     In reality, Plaintiff was terminated so that Defendants could continue the theft and misappropriation of his intellectual property without further interference from Plaintiff, and because Plaintiff had complained of other unlawful activities within IBM.

152.     Just days before Plaintiff was to leave IBM, Defendant Ramamurthy demanded a list of all customer prospects that Hayden was working on with AML Partners from Defendant Suarez, even though Defendant Ramamurthy knew they were AML Partners contacts, not IBM's, and despite the fact that Defendant Ramamurthy was in the Watson Division.

153.     Unexplained was why Ramamurthy, a high-ranking Watson executive, would need a list of GBS prospects.

154.     Despite this glaring irregularity, Defendant Suarez directed one of his subordinates, Juan Powell, to obtain the prospect list for Defendant Ramamurthy.

155.     The improper nature of Plaintiff's termination is illustrated by IBM's shifting attempts to justify or explain it.

156.     Initially, IBM told the Connecticut Department of Labor that Plaintiff was terminated due to "lack of work."

157.     However, IBM then told OSHA, in response to a Sarbanes Oxley complaint filed by Plaintiff, that Hayden had been fired due to a lack of skill.

158.     Then IBM changed the justification again, claiming that Plaintiff couldn't sell anything – an obvious falsehood.

E.    **IBM Breaches the Agreement Regarding Confidential Information,
Intellectual Property, and Other Matters and Misappropriates
Hayden's Trade Secrets.**

159.    From the moment that Defendants Suarez and Ramamurthy were informed and
trained in Hayden's A2E methodology, they began a scheme to steal it.  Defendant Ramamurthy
even formed a secret Committee to orchestrate stealing credit for IBM's totally new IBM
company strategy that they now call, " Business Process Platforms."

160.    Due to the actions of Defendants Suarez and Ramamurthy, as well other senior-
level executives at IBM, Plaintiff was repeatedly excluded from engagements involving the use
of his A2E, including National Australia Bank, DBS, OP Bank, Ocean Bank, Mizhuo, BBVA,
Rand Merchant Bank, Equifax, AIIB, and others, as detailed above.

161.    Plaintiff's trade secrets were also improperly shared with IBM's Watson Division
(supervised by Defendant Ramamurthy), IBM Partner Fenergo, with IBM's recently acquired
Red Hat subsidiary, and with third-parties such as Salesforce.com, Service Now, and many
others.

162.    Following Plaintiff's unlawful termination, IBM continued to aggressively exploit
and misappropriate Plaintiff's A2E, using Plaintiff's trade secrets to land deals with numerous
leading financial institutions as well as developing Partnership with Firms such as CRM
Magazine, American Banker, Financial Brand, LinkedIn and other media firms.  IBM also
misappropriated Hayden's A2E by incorporating the methodology, without Hayden's knowledge
or consent, into its products and services, including but not limited to IBM Hybrid Cloud, IBM
Cloud for Financial Services, Cloud Pack 4 Data, IBM Cognitive Enterprise, Business Process
Platform, Salesforce, and consulting services, among others.

163.    In addition, Plaintiff's trade secrets were repeatedly disclosed to the public,
thereby destroying or dramatically reducing their value.

### i. IBM's Repeated Public Disclosures of Plaintiff's Trade Secrets

164.    A month after Hayden was terminated by IBM under the pretext of a "lack of work", Brian Murrow, Anthony Lipp and Kwafo Ofori-Boateng wrote and published public white papers incorporating A2E concepts.

165.    For instance, Brian Murrow's white paper was posted on LinkedIn just days after Plaintiff's last day at IBM (October 15, 2018).

166.    Murrow's white paper was simply a rewrite of Plaintiff's confidential November 2017 white paper, to which Murrow had access.

167.    Murrow reported to Michael Henry and therefore had access to A2E, which had been shared and improperly used by Henry.

168.    Lipp's and Ofori-Boateng's white papers were also released within approximately a week of Plaintiff's last day at IBM.

169.    Aside from sometimes using slightly different language (e.g., "Customer-centric" becomes "Customer Experience"), all of these white papers incorporate and reflect Plaintiff's major A2E concepts and intellectual property.

170.    One of Plaintiff's contacts at AML Partners saw Murrow's published white paper on LinkedIn, and recognizing the A2E content, sent it to Hayden.

171.    Plaintiff wrote a cease and desist letter to Diane Gherson, the Senior Vice President of Human Resources at IBM, requesting that IBM stop the disclosure of Plaintiff's trade secrets.  Gherson never replied.

172.    Plaintiff also requested that none of his A2E content be used at IBM's Think 2019 conference, then a few months away.  Think is the Company's premier client and developer

conference attended by many thousands including IBM Partners, vendors, and the press and media.

173.    Despite Plaintiff's request, IBM's Chairperson, CEO, and President, Virginia Rometty, basically read major aspects of A2E IP from Plaintiff's "Future Financial Performance of Banking" white paper during her kick-off speech at Think 2019.

174.    Similarly, IBM senior executives continued to publish articles, books and white papers disclosing Plaintiff's A2E, a breach of IBM's agreement to keep Plaintiff's trade secrets confidential that continues to this day.

175.    For instance, in December 2019, Sarah Diamond, IBM's Global Managing Director for Banking and Financial Markets, published an article that lifted statements directly from Plaintiff's confidential "Future Financial Performance in Banking" white paper and Hayden's confidential master A2E slide deck, both of which Diamond had in her possession. Thus, Diamond – an extremely high-ranking IBM executive – also knowingly disclosed Plaintiff's protected intellectual property and trade secrets.

176.    Defendant Suarez also published a white paper in February 2020.  The Suarez white paper incorporated much of the same content from the presentation materials that Plaintiff had prepared using A2E concepts for the BBVA engagement approximately two years before and the National Australian Bank engagement approximately four years before.  Defendant Suarez had access to these confidential materials and then publicly disclosed Plaintiffs' trade secret information contained therein.

177.    In another example, Forbes magazine ran an article in July 2020 on IBM's "Integrated Risk Model," a concept that is described in detail in Plaintiff's November 2017 white paper.

178.     Yet the article states that IBM only began work on the model in the fall of 2019, *two years after* Plaintiff's A2E white paper.

179.     On July 30, 2020, Red Hat released a video that incorporated Plaintiff's trade secrets as set forth in his A2E master slide deck, Plaintiff's white papers, the presentation for National Australian Bank, and the papers prepared by Plaintiff for BBVA.

180.     The Red Hat video was also posted on LinkedIn on July 30, 2020.

181.     Notably, none of the individuals listed as the authors of the Red Hat video has a banking background.

182.     Another vehicle for the intentional disclosure of Plaintiff's A2E trade secrets has been IBM's "Institute for Business Value."   A number of publications of the Institute for Business Value are directly based on A2E, including publications "authored" by Defendants Ramamurthy and Suarez, and Anthony Lipp, all of whom had access to Plaintiff's A2E master deck, white papers, and client presentations.

### ii.     Partnership with Wells Fargo

183.     In November 2019, IBM announced a strategic partnership with Wells Fargo concerning artificial intelligence and quantum computing.

184.     Wells Fargo's Head of Innovation, Lisa Frazier, issued a press release about this partnership which included references to A2E concepts.

185.     In particular, Frazier's press release makes several of the very same points as are contained in Plaintiff's "Future Financial Performance in Banking" white paper.

186.     IBM's Bill Fuessler claimed credit for this sale.  Fuessler was a very senior IBM executive who Plaintiff trained for several hours on A2E in New York City.  Bingham and Cohen also participated in the meeting with Fuessler.  Fuessler had even met with Defendants

34

Suarez and Ramamurthy along with Hayden, Bingham and Cohen to gain Funding for the A2E

Platform Strategy and they declined, as it turns out because they had decided already to steal it

for free and make it their own.

187.    Plaintiff received a report of the Wells Fargo deal from a colleague who saw the

report and recognized Plaintiff's IP.

188.    Plaintiff emailed Fuessler and the head of Human Resources at IBM, Diane

Gherson, advising IBM to cease and desist unauthorized use of A2E.  The unauthorized use

however, continued unabated.

### iii.    IBM's Hybrid Cloud

189.    IBM's Hybrid Cloud, which the Company has stated will be IBM's leading

source of revenue and profitability in the future, is another A2E derivative.

190.    Prior to Hayden's involvement, all that IBM had was a limited private cloud

model being ranked 4th in Cloud Market Share and ranked 6th in Capabilities by a third party

source.

191.    Hayden taught IBM the necessity of employing A2E through connectivity with

numerous data centers belonging to different parties, also known as Hybrid Cloud.

192.    As a result of Hayden's trade secrets, IBM bought a Hybrid Cloud company and

then built Cloud Pack 4 Data which in IBM's own words was "A First in Global Financial

Services History."

193.    With a Hybrid Cloud model, numerous data centers (and their data) can be

connected as outlined in A2E through IBM's cloud architecture.  This effectively puts IBM at the

crossroads of massive amounts of intra-organizational and inter-organizational data processing

and data exchanges, enabling IBM to capitalize like a toll bridge, under its billing model that charges customers based on the number of processed data transactions.

194.    IBM markets its Hybrid Cloud product to banks and financial service institutions as IBM Cloud Pack 4 Data, again an A2E derivative.

195.    It is estimated that IBM's Hybrid Cloud products are generating billions of dollars in sales revenue for IBM.

### iv.    Other Examples of IBM's Ongoing Misappropriation of Plaintiff's IP

196.    Since unlawfully terminating Plaintiff, IBM has aggressively moved to profit from his A2E trade secrets.

197.    For instance, IBM has already entered into deals worth hundreds of millions of dollars with Bank of America, BBVA Spain, and WestPac Australia, among others, all exploiting Plaintiff's A2E.

198.    Utilizing Plaintiff's trade secrets improperly divulged by IBM, Bank of America has been filing patents relating to aspects of A2E.

## V.    CAUSES OF ACTION

### Count 1
### Defend Trade Secrets Act
### 18 U.S.C. § 1831, et seq.

199.    Plaintiff realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

200.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832, criminalizes the following conduct:

> (a)    Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone

other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly –

(1) steals, or without authorization, appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates or conveys such information;

(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(4) attempts to commit any offense described in paragraphs (1) through (3); or

(5) conspires with one or more persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.

(b) Any organization that commits any offense described in subsection (a) shall be fined not more than the greater of $5,000,000 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has avoided.

201.    The prohibitions of the DTSA apply to conduct occurring within and outside the United States if (1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States.  18 U.S.C. § 1837.

202.    The DTSA authorizes the owner of a trade secret that is misappropriated to bring a civil action to defend it if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.  18 U.S.C. § 1836(b).

203.    Hayden created and developed A2E and EERT before joining IBM.

204.    A2E is an advanced methodology that takes separate and serial workflows from any business or industry and makes them integrated, simultaneous and real-time customer level executable.

205.    EERT is a measurement rubric used to measure the efficacy and efficiencies generated by implementing the A2E methodology.

206.    Hayden's A2E methodology is related to products or services intended for use in interstate or foreign commerce.

207.    The Individual Defendants are citizens or permanent resident aliens of the United States.

208.    IBM is an organization and a Delaware corporation, with its principal place of business in the State of New York.

209.    By virtue of the acts alleged herein, Defendants have knowingly stolen Hayden's A2E methodology in violation of 18 U.S.C. § 1832(a).

210.    By virtue of the acts alleged herein, Plaintiff has suffered substantial monetary damages, including but not limited to lost salary and bonuses, lost business opportunities, and lost royalties and profits from the exploitation of his trade secrets.

211.    As a result of Defendants' acts, Plaintiff has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and is entitled to penalties of at least $2 billion for each and every violation of 18 U.S.C. § 1831 arising from Defendants' unlawful conduct as described herein.

## Count 2
## Trade Secret Misappropriation
## (New York Common Law)

212.     Plaintiff realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

213.     The elements of a cause of action to recover damages for trade secret misappropriation under New York law are: (1) possession of a trade secret; and (2) use of that trade secret by the defendant in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.

214.     Plaintiff created and developed A2E and EERT before returning to IBM.

215.     When Plaintiff rejoined IBM, he executed a Confidential IP Agreement, that put IBM on notice of Hayden's possession of his A2E and EERT trade secrets and his right, title and interest thereto.

216.     After Hayden was terminated from his employment with IBM, Defendants used Hayden's A2E and EERT trade secrets to develop and market products and services to customers.

217.     Plaintiff never authorized Defendants to use his A2E and EERT trade secrets.

218.     Defendants used Hayden's A2E and EERT trade secrets in violation of the Confidential IP Agreement when it authored and developed products and services incorporating the A2E methodology and EERT rubric.

219.     As a result of Defendant's misappropriation of Hayden's A2E methodology and EERT rubric, Hayden has been deprived of royalties, and the value of his trade secrets has been diminished by virtue of Defendants' dissemination of these trade secrets to third parties.

**Count 3**
**Breach of Contract**
**(New York Common Law)**

220.     Plaintiff realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

221.     After Plaintiff rejoined IBM, he executed a Confidential IP Agreement on November 2, 2015.

222.     Hayden executed the Confidential IP Agreement as a condition of and in consideration for his employment with IBM.

223.     The Confidential IP Agreement expressly reserved Plaintiff's right, title and interest in A2E and EERT, methodologies he conceived and developed prior to rejoining IBM.

224.     The Confidential IP Agreement excluded Hayden's A2E and EERT trade secrets from IBM's use and ownership.

225.     After Hayden was terminated from his employment with IBM, Defendants used Hayden's A2E and EERT trade secrets to develop and market products and services to customers.

226.     Plaintiff never authorized Defendants to use his A2E and EERT trade secrets.

227.     Defendants used Hayden's A2E and EERT trade secrets in breach of the Confidential IP Agreement when it authored and developed products and services incorporating the A2E methodology and EERT rubric.

228.     As a result of Defendant's breach of the Confidential IP Agreement, Hayden has been damaged by being deprived of royalties, and the value of his trade secrets has been diminished by virtue of Defendants' dissemination of these trade secrets to third parties.

**Count 4**
**Breach of the Covenant of Good Faith and Fair Dealing**
**(New York Common Law)**

229.    Plaintiff realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

230.    Defendants knew that Hayden had reserved his rights, title and interest to his A2E and EERT trade secrets.

231.    When Defendants realized the value of A2E and EERT to develop products and services, Defendant formed a scheme to steal these secrets and fire Hayden to deprive him of any compensation or remuneration for their use.

232.    After terminating Hayden's employment, Defendants employed A2E and EERT trade secrets to develop products and services that they sold to customers without Hayden's authorization.

233.    Defendants terminated Hayden in bad faith to steal his trade secrets.

234.    Defendants' trade secret misappropriation and breach of the Confidential IP Agreement constitutes a violation of the covenant of good faith and fair dealing.

235.    As a result of Defendants' violations of good faith and fair dealing, Plaintiff has suffered damages.

**Count 5**
**Unjust Enrichment**
**(New York Common Law)**

236.    Plaintiff realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

237.    Defendants were enriched by the use of Plaintiff's A2E.

238.    In the case of Defendant IBM, this unjust enrichment took the form of deals worth many billions of dollars.

239.   The Individual Defendants were unjustly enriched by receiving bonuses and other compensation directly resulting from the use of Plaintiff's A2E.

240.   Defendants' enrichment was at Plaintiff's expense, in that Defendants benefitted from Plaintiff's efforts and from the theft of his intellectual property without compensation to Plaintiff.

241.   It would be against equity and good conscience to permit Defendants to retain what is sought to be recovered in this action.

## Count 6
## Tortious Interference with Prospective Economic Advantage
## (New York Common Law)

242.   Plaintiff realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

243.   Defendants interfered with Plaintiff's economic prospects, including bonuses and compensation, arising from numerous deals both before and after his termination from IBM; these include without limitation National Australian Bank, DBS, OP Bank, JP Morgan Chase, Ocean Bank, Mizuho, BBVA, Rand Merchant Bank, and Equifax, among others.

244.   Defendants' conduct was wrongful and culpable, and included the misappropriation of Plaintiff's protected trade secrets, as well as Plaintiff's wrongful termination.

245.   Defendants' wrongful conduct constitutes an independent tort.

## Count 7
## Retaliatory Discharge - Sarbanes Oxley
## (18 U.S.C. § 1514A)

246.   Plaintiff realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

247.    In connection with the occurrences and conduct set forth herein, Plaintiff developed concerns that Defendant IBM was engaged in violations of the federal securities laws, including "contact stuffing" and other attempts to mislead the markets concerning relating to revenues attributed to IBM's Watson division.

248.    These concerns were reported to IBM.

249.    On March 29, 2018, and as directed by Plaintiff's Manager, Plaintiff filed a written complaint with Michael Andrud, the Lead Bank Data & Cognitive Consulting Partner at IBM.

250.    After Plaintiff filed the Complaint, IBM retaliated against Plaintiff, unlawfully terminating his employment.

251.    When IBM retaliated against Plaintiff, IBM was aware that Plaintiff had engaged in protected conduct pursuant to the Sarbanes-Oxley Act.

## VII.    PRAYER FOR RELIEF

WHEREFORE, on each of these claims, Plaintiff requests the following relief be ordered:

A.    A declaratory judgment that Defendants' exploitation, misappropriation, or disclosure of Plaintiff's trade secrets, intellectual property, or ideas is unlawful;

B.    An injunction against any further exploitation, misappropriation, or disclosure of Plaintiff's trade secrets, intellectual property, or ideas;

C.    Compensatory and punitive damages, including but not limited to a share of profits from IBM's Hybrid Cloud platform and any and all related products and services developed, marketed and/or sold with Plaintiff's trade secrets, intellectual property, or ideas; and

D.    Such other and further relief as the Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated:  March 22, 2021

Respectfully submitted,

By: _____
Robert A. Magnanini
David S. Stone
Robert D. Goodman
Julio C. Gomez
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@stonemagnalw.com
dstone@stonemagnalaw.com
rgoodman@stonemagnalaw.com
jgomez@stonemagnalaw.com

James M. Evangelista
Stuart J. Guber (pro hac vice pending)
EVANGELISTA WORLEY, LLC
500 Sugar Mill Road, Suite 245A
Atlanta, GA 30350
Phone: (404) 205-8400
Jim@ewlawllc.com

*Attorneys for Plaintiff*