UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
GERALD HAYDEN,                                    :
               Plaintiff,                    :
                                                   :
v.                                                 :          **<u>OPINION AND ORDER</u>**
                                                   :
INTERNATIONAL BUSINESS MACHINES      :          21 CV 2485 (VB)
CORPORATION, PABLO SUAREZ, and         :
SHANKER RAMAMURTHY,                      :
              Defendants.                  :
---------------------------------------------------------------x

<u>Briccetti, J.</u>:

Plaintiff Gerald Hayden brings claims against defendants International Business

Machines Corporation ("IBM"), Pablo Suarez, and Shanker Ramamurthy, under the federal

Defend Trade Secrets Act ("DTSA") and for violating New York's prohibition on the

misappropriation of trade secrets. Plaintiff also brings a number of other claims under New York

and federal law: breach of contract, breach of the implied covenant of good faith and fair

dealing, unjust enrichment, tortious interference, and retaliatory discharge under the Sarbanes-

Oxley Act.

Now pending are defendants' motions (i) to preclude the testimony of plaintiff's expert,

David Martin (Docs. ##293, 296), and (ii) for summary judgment (Doc. #259). For the reasons

set forth below, the motion to preclude is GRANTED, and the motion for summary judgment is

GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

The parties have submitted briefs, statements of material fact pursuant to Local Civil

Rule 56.1, and affidavits and declarations with exhibits. Together, these submissions reflect the

following factual background.

I.    "A2E"

Plaintiff was employed at IBM from November 2015 until his termination in October 2018.  (Doc. #267 ¶¶ 1, 12).  He has 35 years of experience in the financial services sector. (Doc. #281 ¶ 1).  Defendant IBM is a technology company headquartered in Armonk, New York.

Prior to joining IBM in 2015, plaintiff developed a "methodology to construct an architecture for a digital platform," which he called "Awareness to Execution" ("A2E").  (Doc. #265 at 18).  Plaintiff developed this methodology while working at other financial institutions, such as MetLife and Cisco Systems, from 1998 to 2015.  (Doc. #279 ¶ 46).  He refers to this methodology as his "trade secret."  (Doc. #265 at 1).

According to plaintiff, his alleged trade secret "describes an architecture for an IT solution that creates a digital platform which accesses data in near real-time . . . and applies big data prescriptive and predictive analytics."  (Doc. #281 ¶ 5).  A2E "can also be used as a methodology to market and sell the various components or elements of the digital platform, individually or in combination with each other."  (Id.).  This methodology "involves a combination of software, hardware, and other elements which constitute the digital platform and enable particular features and functions."  (Id.).  According to plaintiff, "all of the elements of his trade secrets . . . which he claims were misappropriated in this case were invented no later than" May 2011 and were memorialized in a slide deck entitled "From Awareness to Execution (A2E)."  (Doc. #262-31 at 25).  Plaintiff describes this alleged trade secret as his "life's work." (Doc. #262-31 at 56).

II.    <u>Plaintiff's Employment at IBM</u>

Plaintiff joined IBM in November 2015 as an "Industry Consultant" in the company's Global Business Services Unit.[1] (Doc. #279 ¶ 6).  In March 2017, plaintiff began reporting to defendant Suarez, the Vice President and Global Leader of the Financial Services Sector.  (Doc. #279 ¶ 8).  At the time, defendant Ramamurthy was a General Manager at IBM and reported to senior IBM executives.  (Doc. #281 ¶ 28).

A.    <u>The ARCIIP</u>

When plaintiff joined IBM, he entered into an agreement entitled "Agreement Regarding Confidential Information, Intellectual Property, and Other Matters" (Doc. #262-22 "ARCIIP"). (Doc. #279 ¶ 19).  Per the ARCIIP, plaintiff agreed to not disclose "any confidential information or material of IBM, or any information or material received by IBM in confidence from third parties, such as suppliers or customers."  (ARCIIP ¶ 1).  Plaintiff also agreed "not [to] disclose to IBM . . . any information or material which is confidential to any third party unless authorized by IBM."  (<u>Id</u>. ¶ 3).

The ARCIIP assigns to IBM any intellectual property that employees create during their employment unless an existing contract bars them from doing so.  (ARCIIP ¶ 5).  To that end, paragraph 8 of the ARCIIP requires employees to identify any intellectual property not assigned in paragraph 5.  (<u>Id</u>. ¶ 8).  In response to this prompt, plaintiff wrote "none see below."  (<u>Id</u>. at ECF 3).[2]  In the designated section of the agreement, where employees are directed to "not fill in this section" if they had "entered 'none' in Paragraph 8," plaintiff wrote "A2E, EERT" and

---

[1]    Plaintiff had previously worked at IBM from 1996 to 1997.  (Doc. #275 ¶ 3).  None of plaintiff's claims relates to his prior period of employment with IBM.

[2]    "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing System.

"copyright trademarks and related pending patents and software and related intellectual content, properties, workflows, etc." (Id. at ECF 3). Per the contract, an employee who wishes to "interest IBM" in his unassigned intellectual property is directed to "contact the Intellectual Property and Licensing Department at Corporate Headquarters." (Id.). It is undisputed that plaintiff did not contact the Intellectual Property and Licensing Department regarding his alleged trade secret. (Doc. #279 ¶ 28).

The ARCIIP also includes a clause stating that the contract "supersedes all previous oral or written communications, representations, [or] understandings" and that any amendments to the contract may only be made in writing signed by the parties. (ARCIIP ¶ 12). The ARCIIP between plaintiff and IBM was never amended and the ARCIIP was the only contract between plaintiff and IBM regarding intellectual property. (Doc. #279 ¶ 27).

Although plaintiff does not dispute that he signed the ARCIIP, he contends a human resources representative told him the ARCIIP would protect his personal intellectual property. (Doc. #279 ¶ 24). According to plaintiff, he also "[o]btained assurances" from IBM that it would not steal his alleged trade secret and was advised to use "IBM templates and/or legends" to "protect[] his A2E under IBM's NDA with customers or partners." (Doc. #281 ¶ 11(2), (3)). Moreover, plaintiff contends the ARCIIP requires that employees comply with IBM's "Business Conduct Guidelines" (Doc. #265 at 11), which instruct IBM employees who receive "another party's proprietary information" to "proceed with caution to prevent any accusation that IBM misappropriated or misused the information." (Doc. #273-28 at 19; see also ARCIIP ¶ 4 ("I will comply, and do all things necessary for IBM to comply, with . . . the IBM Business Conduct Guidelines.")).

4

B.    Plaintiff's Work at IBM

Soon after he started at IBM, plaintiff began utilizing A2E in his work.  Within the first six months of his employment, plaintiff worked on a potential project for National Australia Bank ("NAB").  For this engagement, plaintiff prepared an outline (the "NAB Outline") and presentation (the "NAB Deck") that included slides from his A2E "master deck."  (Doc. #279 ¶¶ 120–21; Doc. #281 ¶ 21).  Plaintiff shared the NAB Outline and NAB Deck with the potential client and IBM colleagues, but also sent these materials to individuals outside of IBM.  (Doc. #279 ¶¶ 123–31).  Although these materials were often marked as "confidential," none of these individuals had signed non-disclosure agreements ("NDAs") related to plaintiff's work product, specifically A2E.

Through the NAB project, plaintiff met and began working with his IBM colleagues Daniel Bingham, Daniel Gotlieb, and Steve Cohen to develop products based on A2E.  (Doc. #270 ¶¶ 10–11; Doc. #271 ¶¶ 7–8; Doc. #281 ¶ 23).  This group, which became known as the "Banking as a Platform" ("BaaP") or "Customer as a Platform" ("CaaP") team, met with potential clients and IBM executives to "persuade them to fund and develop products based on [plaintiff's] A2E."  (Doc. #270 ¶ 11; Doc. #281 ¶ 23).  According to Bingham, when members of the BaaP team would meet with potential clients, including financial institutions such as American Express and Equifax, they were met with "extremely positive" and "enthusiastic" reactions.  (Doc. #270 ¶¶ 25, 27).  The potential clients "understood the uniqueness and value of A2E" and "were very interested in working with [plaintiff] and [the BaaP] team."  (Id. ¶ 25).  In one instance, an executive at a large credit bureau began "visibly shaking because she understood the importance of the A2E principles" and "their value to her company."  (Id. ¶ 28).

5

Plaintiff and the BaaP team also met with IBM executives to attempt to obtain funding for potential products based on A2E.  In July 2017, plaintiff and Bingham met with Ramamurthy, who was Bingham's supervisor at the time, and Suarez to discuss A2E.  (Doc. #270 ¶¶ 15–16).  Following this meeting, plaintiff and Bingham met with additional IBM executives, who, according to Bingham, were "thoroughly impressed" and "extremely excited" by A2E.  (Id. ¶¶ 18–19).  Plaintiff and Bingham also met with a senior architect at an IBM subsidiary who stated he would be able to "code and build" one of the elements "contemplated by A2E."  (Id. ¶ 22).

During these meetings with clients and executives, plaintiff shared documents that "described and explained" plaintiff's alleged trade secret.  (Doc. #279 ¶ 75).  These documents included his A2E master deck (Doc. #270 ¶ 12); a whitepaper entitled "The WHAT, WHY, and HOW of Digital Marketplaces (and Fintech)" (the "What, Why, and How Paper") (Doc. #279 ¶ 75); a whitepaper entitled "The Future of Bank Financial Performance Management" (the "Future Article") (id. ¶ 80); a whitepaper entitled "Treasury Management Mobile Connect, a Benchmark Case Study" (the "Benchmark Study") (id. ¶¶ 66–67); and multiple slide decks (the "BaaP Deck" and the "CaaP Deck") (id. ¶¶ 99, 108).  Some of these documents, such as the Benchmark Study and the What, Why, and How Paper, were sent by plaintiff to IBM while he was negotiating his potential employment with the company.  (Id. ¶¶ 69, 77–78).

Plaintiff took certain measures to protect the confidentiality of A2E when he shared these materials.  He often—but not always—labeled such documents as "confidential" or "not to be shared" (Doc. #281 ¶ 11(5)), gave "oral admonitions" about the proprietary nature of A2E (id. ¶ 11(7)), "carefully limited the information in his writings and slide presentations to exclude necessary details to reverse engineer or execute on his trade secret" (id. ¶ 11(6)), and "[r]eported

suspicions of employees taking credit for his IP or using it without his express authorization."
(Id. ¶ 11(9)).

Plaintiff also emailed these documents to other individuals who were neither employees of IBM nor of any potential client companies.  (Doc. #279 ¶¶ 106, 131).  These documents sometimes, but not always, included confidentiality markings.

Despite the BaaP team's meetings with IBM executives, Ramamurthy eventually informed Bingham that "IBM had no interest in pursuing" a strategy to implement A2E into any of its product offerings or solutions.  (Doc. #270 ¶ 20).

       C.     <u>Plaintiff's Concerns about Alleged Misappropriation</u>

Soon after he joined IBM, plaintiff became suspicious that other IBM employees were attempting to "tak[e] credit" for his alleged trade secret.  (Doc. #265 at 9).  For example, plaintiff contends in December 2016 an IBM employee emailed plaintiff to try to "bait" plaintiff into disclosing his alleged trade secret.  (Doc. #279 ¶¶ 148–49).  A few months later, in March 2017, plaintiff emailed Suarez to report his concerns that other employees had learned of plaintiff's alleged trade secret and were attempting to "lay claim" to it.  (Id. ¶ 151).  In October 2017, Cohen emailed plaintiff, Suarez, and Bingham to alert them that IBM employees in Scandinavia had circulated a presentation that resembled one of plaintiff's whitepapers about A2E.  (Id. ¶ 153).

Despite his concerns, plaintiff testified he did not suspect at this time that defendants were misappropriating his trade secret and employing it to develop other products, but only that other IBM employees were trying to claim credit for A2E.  (Doc. #279 ¶¶ 152, 160).

After plaintiff's employment was terminated in October 2018, he began to suspect that defendants had misappropriated A2E and begun incorporating it into "Cloud Paks"—a line of

software products.  (Doc. #265 at 6).  Because plaintiff did not work in the relevant departments

where Cloud Paks were developed, and claims he was in fact deliberately excluded by IBM from

such processes, he says he did not realize defendants had misappropriated and implemented A2E

in its Cloud Paks until those products were launched in 2019.  (Doc. #265 at 5–6).

      D.    <u>Plaintiff's Internal Complaints of Financial Improprieties</u>

In early 2018, plaintiff and other members of the BaaP team became concerned about

possible financial improprieties within IBM.  Plaintiff testified that on March 29, 2018, he wrote

to Mike Andrud, a lead partner and Gotlieb's supervisor, about these alleged improprieties.  No

such email or complaint was produced in discovery.  (Doc. #279 ¶ 161).

On May 10, 2018, plaintiff emailed Andrud regarding his concern over potential

securities law violations and suggested that other IBM employees were engaging in "contract

stuffing."  (Doc. #279 ¶¶ 162–64).  Plaintiff testified he filed his complaint with Andrud, the

engagement partner on some of the allegedly fraudulent transactions (Doc. #270 ¶ 35), at

Suarez's direction, but did not inform Suarez directly of the complaint.  (Doc. #279 ¶¶ 165, 171).

However, plaintiff testified Suarez was aware of his concerns.

In addition to plaintiff, Cohen and Gotlieb also reported similar concerns to Andrud.

(Doc. #271 ¶ 28).  Andrud reported Gotlieb's concerns to IBM's legal department.  In or around

June 2018, Gotlieb was interviewed by two IBM lawyers about his allegations.  (<u>Id</u>.).  During the

interview, Gotlieb told the lawyers that they should also speak with plaintiff.  (<u>Id</u>.).  Shortly after

Gotlieb's interview, Andrud and Gotlieb were both terminated.  (<u>Id</u>.).

      E.    <u>Plaintiff's Termination and Aftermath</u>

In July 2018, Suarez emailed plaintiff and informed him he was at the "wrong

organization for [his] skill sets."  (Doc. #262-20 at ECF 2; Doc. #279 ¶ 16).  Suarez attached

several documents that he contended would help plaintiff "actually find the right job role within IBM" (Doc. #262-20 at ECF 2), and distributed plaintiff's resume to other departments within the company. (Doc. #279 ¶ 17). In his email, Suarez stated that plaintiff had until October 11, 2018, to find another role at IBM. (Doc. #264-20 at ECF 2).

Plaintiff did not find another role at IBM by October 11, 2018, and his employment was terminated on October 31, 2018. (Doc. #279 ¶ 18).

On December 12, 2018, plaintiff filed a complaint against IBM with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor (the "OSHA Complaint"). (Doc. #279 ¶ 173). In the OSHA Complaint, plaintiff alleged he was fired because "on March 29, 2018, he filed a formal complaint to Michael Andrud for channel stuffing" and that "Shanker [Ramamurthy] . . . [and] Pablo Suarez . . . were all collaborating to steal engagements" from one division of IBM and transfer revenues to another. (Id. ¶ 174).

On May 27, 2020, after plaintiff requested that the Department of Labor conclude its investigation, the Department issued its findings and stated it was "unable to conclude that there is reasonable cause to believe that a violation . . . occurred." (Doc. #262-104 at 1). According to the letter, if neither plaintiff nor IBM filed objections to the findings or requested a hearing, the findings would "become final and not subject to court review." (Id. at 2). It is undisputed that neither plaintiff nor IBM filed objections or otherwise appealed the Department's findings.

Plaintiff commenced this action on March 22, 2021.

## DISCUSSION

I.    Admissibility of Plaintiff's Expert's Testimony

Defendants move to exclude the proffered testimony of plaintiff's expert, David Martin. Defendants do not dispute Martin's qualifications regarding the topics for which he has been

engaged to testify.  Instead, defendants argue Martin's opinions are irrelevant and that his

methodologies warrant exclusion of his testimony.  Specifically, defendants argue Martin's

opinions are not based on sufficient facts and that he does not apply reliable methodologies to

reach his conclusions.

The Court agrees.

A.    Rule 702 and Daubert

Pursuant to Rule 702 of the Federal Rules of Evidence, a witness "who is qualified as an

expert by knowledge, skill, experience, training, or education" may testify if:  "(a) the expert's

scientific, technical, or other specialized knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

the testimony is the product of reliable principles and methods; and (d) the expert's opinion

reflects a reliable application of the principles and methods to the facts of the case."

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), trial

courts serve as gatekeepers for expert testimony.[3]  When deciding a motion for summary

judgment, trial courts may also decide whether expert testimony is admissible.  Raskin v. Wyatt

Co., 125 F.3d 55, 66 (2d Cir. 1997).  "Rule 702 requires a trial court to make an initial

determination as to whether the proposed witness qualifies as an expert."  Baker v. Urban

Outfitters, Inc., 254 F. Supp. 2d 346, 352 (S.D.N.Y. 2003).  "If this threshold requirement is met,

then a court must inquire into whether the scientific, technical or other specialized testimony

provided by that expert is both relevant and reliable."  Id. at 352–53.  The proponent of expert

---

[3]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Id. at 353.

The Supreme Court has articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology:  (i) whether the theory or technique relied on has been tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (iv) whether the theory or method has been generally accepted by the scientific community.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593–94.  However, these factors do not constitute a "definitive checklist or test."  Id. at 593. Rather, a court should apply these factors flexibly.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999).

Moreover, "in analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002).  This includes the "discretion under Federal Rule of Evidence 703 to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony."  Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996).  "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d at 267. "Only the methodology, not the district court's belief as to the correctness of such conclusions, is the focus of a Daubert inquiry."  Schoolcraft v. City of New York, 2015 WL 6444620, at *2 (S.D.N.Y. Oct. 23, 2015).

"[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse</u> <u>dixit</u> of the expert." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).  An expert must give "some explanation of the data, studies, or reasoning" used.  <u>Donnelly v. Ford Motor Co.</u>, 80 F. Supp. 2d 45, 50 (E.D.N.Y. 1999).  With such an explanation, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. at 146.  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, <u>Daubert</u> and Rule 702 mandate the exclusion of that unreliable opinion testimony."  <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d at 266.  Simply put, a court should exclude expert testimony when it is "speculative or conjectural, or if it is based on assumptions that are . . . in essence an apples and oranges comparison."  <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F.3d at 21.

      B.     <u>Application</u>

Plaintiff offers Martin as an expert to opine on the nature and value of A2E.  Martin is a risk management consultant with over 40 years of experience as a financial executive.  (Doc. #298-1 ("Martin Report") ¶ 1).  He has held senior positions at PricewaterhouseCoopers, Citibank, and AllianceBernstein, and has "extensive experience with technological solutions in the banking and financial markets industries."  (<u>Id</u>.).  To reach his conclusions, Martin "reviewed materials produced by all parties in discovery, written discovery responses, deposition testimony, and exhibits" and "relied upon my education, my professional experience and background," and "the documents and data cited in [his] report."  (<u>Id</u>. ¶ 9).  According to Martin, plaintiff's counsel directed him "to assume for purposes of this report that a trade secret is any formula, pattern,

device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  (Id. ¶ 7).

At plaintiff's request, Martin addressed the following seven questions in his report:

Question One:  Is A2E a "formula, pattern, device, or compilation of information which is used in one's business?"

Question Two:  Prior to 2015, when [plaintiff] joined IBM, were the formulas, architectures and solutions contained in A2E known by competitors outside of IBM or inside of IBM?  If so, would IBM or its competitors have been able to implement A2E without access to Hayden's trade secret?

Question Three:  In 2015, would A2E have given IBM an opportunity to obtain an advantage over competitors who do not know or use it?

Question Four:  In 2015 when [plaintiff] joined IBM was IBM offering any services or products which were based on those formulas[,] solutions or architectures?

Question Five:  After Hayden joined IBM and disclosed aspects of his A2E to IBM, did IBM offer any products or services which in your opinion were derived from Hayden's A2E?  If so, which ones?

Question Six:  In your opinion, did IBM have an advantage over competitors and derive revenues from A2E?  If so, which revenues of IBM were related to its use of A2E?

Question Seven:  Based on your review of the record, do you have an opinion of when if ever, IBM would have received those revenues without access to or use of A2E?

(Martin Report ¶ 7).

For the following reasons, Martin's opinions in response to all of these questions must be excluded.

          1.    <u>Reliance on Sufficient Facts or Data or Reliable Methodologies</u>

First, Martin's opinions are inadmissible because he does not rely on sufficient facts or data or employ reliable methodologies to reach his conclusions.  See Fed. R. Evid. 702(b)–(c).

Martin relies primarily on his "40 years of experience as a financial executive."  (Martin Report ¶ 1).  Although an expert can "draw a conclusion from a set of observations based on

extensive and specialized experience," the expert must base that opinion on sufficient facts or

data and "must explain how that experience leads to the conclusion reached, why that experience

is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."

Emig v. Electrolux Home Prods. Inc., 2008 WL 4200988, at *8 (S.D.N.Y. Sept. 11, 2008).

Martin fails to explain how this methodology—namely, the application of his legitimate

knowledge and experience—led him to his conclusions.  See Tolentino v. City of Yonkers, 2017

WL 4402570, at *4 (S.D.N.Y. Oct. 2, 2017).  The failure to show his work is fatal, leaving his

opinions conclusory ipse dixit and therefore inadmissible.

      For his opinions regarding IBM's awareness of A2E and the potential value it posed to

IBM, in response to Question Two, Martin relies solely on his personal experience to conclude

that the solutions embodied in A2E were not known to IBM nor generally known to the market

in 2015.  (See Martin Report ¶ 43 ("In my opinion, I would have been aware if any products or

services which employed A2E strategies or architectures were being offered to a prominent

bank."); see also Doc. #295-2 at 172:1–6 ("I have . . . my own personal knowledge of what's out

there.  And there was nothing—there were no documents that I ever saw that talked about

this.")).  In response to Question Three, Martin also concludes, after reviewing the depositions of

two fact witnesses—one former IBM employee and one witness Martin describes as "an expert

in software technology"—that "without access to [plaintiff's] A2E trade secrets, competitors and

IBM would not have been able to execute on these strategies and solutions."  (Martin Report

¶ 43).

      But Martin does not explain how his knowledge and experience led him to these

conclusions about IBM's internal capabilities and what the company knew, or did not know, at a

certain time.  Martin does not, for example, explain how he was able to conclude that IBM was

not aware of the "formulas, architectures, and solutions contained in A2E" when he was not and had never been employed by—or worked in any capacity with—IBM. (Martin Report ¶ 21). This deficiency undermines Martin's opinion that, without plaintiff's trade secret, IBM would not have been able to execute on its "solutions"; if Martin's opinion that IBM was unaware of certain solutions or strategies is not based on sufficient facts or data, it follows that his related opinion regarding IBM's inability to implement or execute on plaintiff's trade secret is also defective. Thus, Martin's opinions here are inadmissible because they are "connected to existing data only by [his] ipse dixit." Gen. Elec. Co. v. Joiner, 522 U.S. at 146.

Similarly, in response to Question Four, Martin opines that prior to plaintiff's employment, IBM was "not focused on the key elements of A2E" and was "not focused on horizontal integration of workflows." (Martin Report ¶ 51). Martin explains that he reached this conclusion after reviewing plaintiff's deposition and documents produced by IBM that detailed the company's commercial offerings. (Id.). But IBM's publicly available commercial documents, reviewed in tandem with plaintiff's testimony, do not constitute "sufficient facts and data," and Martin does not explain how his knowledge of the banking and financial industries enabled him to conclude, from this set of documents, that IBM did not have certain commercial objectives at a given time. In other words, Martin "provides no sound methodological basis for [his] conclusion." Medidata Solutions, Inc. v. Veeva Systems, Inc., 2021 WL 3773464, at *2 (S.D.N.Y. Aug. 25, 2021). Like Martin's opinions regarding IBM's capabilities in 2015 and its inability to execute on plaintiff's alleged trade secret, there is "simply too great an analytical gap between the data and the opinion[s] proffered" about IBM's commercial objectives at a certain time. Gen. Elec. Co. v. Joiner, 522 U.S. at 146.

15

When Martin moves beyond his own specialized knowledge and applies other methodologies, they are also unreliable. To the extent they are identifiable, Martin's other methods are either prohibited ipse dixit or not helpful to the jury. This is most evident in Martin's opinion, in response to Questions Five and Six, that IBM incorporated elements of plaintiff's trade secret into its Cloud Pak products and therefore "derive[d] revenues from A2E." (Martin Report ¶¶ 120–21). Martin opines that "key combinations of elements that appear in A2E," such as the integration of data, a "unique marketing framework," and a "unique analytic, decision-making process framework," are "incorporated into Cloud Pak." (Id. ¶¶ 87–92). Martin concludes that, because "these many similarities between IBM's Cloud Pak products and A2E cannot be a coincidence," it necessarily follows that "Cloud Pak's overall design and architecture were based on A2E." (Id. ¶ 115). Yet Martin's opinion that these purported similarities necessarily indicate that Cloud Pak was based on A2E is classic ipse dixit and is "not appropriate expert testimony because it is not based on reliable methodology." S.E.C. v. Tourre, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (excluding expert's testimony that "his opinion as to 'economically material' information is based on 'economic logic'"); see also Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 355 (S.D.N.Y. 2005) (excluding as ipse dixit an expert medical opinion that any post-operative drainage necessarily indicated the presence of an infection).

Martin then utilizes another methodology that is equally prohibited. To reach his conclusion that Cloud Pak's design and architecture are based on A2E, Martin compares two slide decks for reference architectures of A2E and Cloud Pak. (Martin Report ¶¶ 95–110). Martin proceeds to compare the graphics between the two slide decks and details how certain graphics in one Cloud Pak slide "correspond" with graphics in plaintiff's A2E slide. (Id. ¶¶ 106–

16

109).  In other words, Martin opines that IBM took each graphic of plaintiff's slide and its

corresponding idea, renamed each graphic, and rearranged these graphics on its own slide.

Based on this comparison, Martin concludes that "IBM's description of its architecture can be

directly correlated with each of the boxes in [plaintiff's] architecture and the slides in his A2E

deck."  (Id. ¶¶ 106–108).

Martin's facial comparison of these two slides is not a reliable methodology sufficient to

survive a Rule 702 challenge.  Martin never examined the source code for any Cloud Pak

product, used any Cloud Pak product, or otherwise examined or tested his conclusions.  See, e.g.,

Gambardella v. Tricam Indus., Inc., 2020 WL 5548825, at *5 (S.D.N.Y. Sept. 16, 2020)

(precluding expert testimony where expert did not "examine" the products at issue "or otherwise

test[] his conclusion[]").  Instead, Martin concludes "A2E IP was the source" of IBM's hybrid

cloud strategy because IBM "appropriated" plaintiff's trade secret and "reformulated it with

slightly different nomenclature."  (Martin Report ¶ 77; see also id. ("For example, Customer

Centricity became Customer Experience" and "Integrated Workflows with analytics . . . became

Intelligent Workflows")).

But a jury could easily compare the two relevant slide decks, conduct the same facial

analysis, and reach the same conclusions.  When an expert "merely look[s] at the two models to

determine whether [defendant] mimicked [plaintiff's] model . . . without applying any

specialized method," including, for example, "comparing the formulas within the cells of the two

models," "comparing the underlying assumptions between the models," or "checking to see if

[defendant] was changing how it benchmarked certain data points in its model," the expert

testimony must be excluded.  Better Holdco, Inc. v. Beeline Loans, Inc., 666. F. Supp. 3d 328,

379 (S.D.N.Y. 2023).  Because Martin "fails to set forth the criteria by which he judged

similarity" or demonstrate any "methodologically sound basis" for his conclusions besides a surface-level comparison of two slide decks, his opinion is not based on any sound methodology as required by Rule 702.   S.E.C. v. Tourre, 950 F. Supp. 2d at 679; see also Better Holdco, Inc. v. Beeline Loans, Inc., 666. F. Supp. 3d at 379 (excluding expert testimony when expert "merely compared two Excel spreadsheets" and did not apply any specialized method "apart from looking at the two models").

Finally, Martin's opinions about how long it would have taken IBM, had it not known about A2E, to build a hybrid cloud platform solution, are also not supported by a reliable methodology.  Martin opines that IBM's use of plaintiff's trade secret gave IBM a "head start" (Doc. #295-2 at 248:13), on its ability to build a software solution using the hybrid cloud because based on Martin's experience developing products prior to 1999 (id. at 258:18–25), "IBM would not have derived these revenues . . . for at least 3 years if it had not had access to [plaintiff's] A2E."  (Martin Report ¶ 121).

Martin "does not provide any methodology for ascertaining how much time [IBM] saved through its alleged use" of A2E.  Medidata Solutions, Inc., v. Veeva Systems, Inc., 2021 WL 3773464, at *2.  Instead, he relies solely on deposition testimony from IBM employees who worked with plaintiff to try to obtain funding for developing A2E, and admits he did not "review any procedures for obtaining approval or funding at IBM for research and development."  (Doc. #295-2 at 256:10–25).  Moreover, Martin even concedes his opinion on this matter is purely a "hypothetical" and not "an exact science," and that the time required to develop a product "really depends on the product, it depends on the sponsor, it depends on the strategy of the company." (Doc. #295-2 at 255:7–8, 255:16–18).  Although Martin has experience with developing products in other contexts and for other companies, he has insufficient facts or data here to opine

specifically about the product development procedures at IBM.  See Bickham v. Coca Cola Refreshments USA, Inc., 2015 WL 7301078, at *4 (S.D.N.Y. Nov. 18, 2015).  Not only would Martin's opinion be unhelpful to a jury, but because his testimony is devoid of "any demonstrated or reliable method for determining the specific degree of head start provided by each alleged use of [plaintiff's] specific [] trade secrets," introducing such evidence would create "a significant risk that the jury would give undue weight to expert opinion shorn of any demonstrable, reliable methodology."  Medidata Solutions, Inc., v. Veeva Systems, Inc., 2021 WL 3773464, at *2.  Therefore, Martin's proffered testimony must be excluded because he relies on no reliable methodology to formulate his opinion and does not base this opinion on sufficient facts or data.

### 2.    Intruding on the Province of the Fact Finder

Martin's testimony also must be excluded because it impermissibly intrudes on the province of the fact finder.

According to Martin, plaintiff's counsel directed him to "assume for purposes of [his] report that a trade secret is 'any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'"  (Martin Report ¶ 7).  After incorporating plaintiff's interrogatory responses that identify the "key elements" of A2E, Martin concludes that "[i]n my opinion, A2E in 2009 and 2015 was a formula, pattern, device, or compilation of information which could be used in one's business that could be coded and implemented with relative ease" (id. ¶ 30), and that A2E "would have given . . . IBM an advantage over their competitors."  (Id. ¶ 22).  Although Martin does not explicitly conclude that A2E is a trade secret—and contends that he has "no opinion with respect to trade secrets" (Doc. #295-2 at 36:5–6)—he assumes for

purposes of his report that a trade secret is a formula that provides a business advantage and concludes that A2E fits this description. Such an opinion is an inadmissible legal conclusion. See United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined No. of Cans of Rainbow Foam Paint, 34 F.3d 91, 96 (2d Cir. 1994).

In addition, Martin engages in credibility determinations by frequently adopting the testimony of fact witnesses in the case to support his own opinions. (See Martin Report ¶ 43 (referencing deposition testimony of a fact witness to conclude that "without access to Hayden's A2E trade secrets . . . IBM would not have been able to execute on these strategies and solutions.")). This is further unhelpful to the jury, because "[t]estimony that directs the trier of fact to believe one account of events over another . . . undertakes to tell the jury what result to reach and attempts to substitute the expert's judgment for the jury's." Marvel Worldwide, Inc. v. Kirby, 777 F. Supp. 2d 720, 730 (S.D.N.Y. 2011), vacated on other grounds, Marvel Characters, Inc. v. Kirby, 726 F.3d 119 (2d Cir. 2013).

Finally, Martin's proffered testimony is inadmissible because his opinions and inferences "serve only to buttress plaintiff['s] theory of the case." In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004). Martin's report is largely "a factual narrative based on [his] review of the discovery in this case," Scienton Techs., Inc. v. Computer Assocs. Int'l Inc., 2012 WL 13105453, at *14 (E.D.N.Y. Sept. 25, 2012), and most of his testimony "set[s] forth opinions on whether defendants violated a legal standard or present[s] a narrative of the case which a lay juror is equally capable of constructing." Taylor v. Evans, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997). For example, Martin lays out a narrative of events that is lifted almost exactly from plaintiff's brief and interrogatories. (Compare Martin Report ¶¶ 28-29, with Doc. #264-31 at 5–9). But "[m]ere narration . . . fails to fulfill Daubert's most basic requirements," as

such narration "does not convey opinions based on an expert's knowledge and expertise" and is not "traceable to a reliable methodology." S.E.C. v. Tourre, 950 F. Supp. 2d at 675. Far from "address[ing] technical questions that may be difficult for a juror to comprehend," LinkCo, Inc. v. Fujitsu Ltd., 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002), Martin's report merely offers "a particular interpretation of defendant's conduct" and "does no more than counsel for plaintiff will do in argument." In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d at 551. If a party attempts to offer argument under the guise of an expert opinion, such opinions must be excluded.

Accordingly, Martin's proffered expert testimony is inadmissible and defendants' motion to exclude it is granted.

## II.  Motion for Summary Judgment

Defendants seek summary judgment on each of plaintiff's claims: misappropriation of trade secrets under federal and state law; breach of contract; breach of the implied covenant of good faith and fair dealing; unjust enrichment; tortious interference; and retaliatory discharge under the Sarbanes-Oxley Act. For the reasons set forth below, the motion for summary judgment must be granted as to all of plaintiff's claims except his unjust enrichment and retaliatory discharge claims.

### A.  Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).  Bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

B.    Misappropriation of Trade Secrets Claims (Counts I and II)

Defendants contend plaintiff's claims for misappropriation of trade secrets under the DTSA and New York law fail because, inter alia, plaintiff does not possess a trade secret as a matter of law.

The Court agrees.

1.    Legal Standard

To succeed on a claim of trade secret misappropriation under the DTSA, a party must prove "(1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret."

22

Better Holdco, Inc. v. Beeline Loans, Inc., 666. F. Supp. 3d at 384.  The DTSA defines a trade

secret as "all forms and types" of information that the owner "take[s] reasonable measures to

keep . . . secret," and that "derives independent economic value . . . from not being generally

known" or "readily ascertainable" by another.  18 U.S.C. § 1839(3).  Under the DTSA,

"misappropriation" is defined as the "acquisition of a trade secret of another by a person who

knows or has reason to know that the trade secret was acquired by improper means," or

"disclosure or use of a trade secret of another without express or implied consent."  18 U.S.C.

§ 1839(5).  "Improper means includes theft, bribery, misrepresentation, and breach or

inducement of a breach of a duty to maintain secrecy, but excludes reverse engineering,

independent derivation, or any lawful means of acquisition."  Town & Country Linen Corp. v.

Ingenious Designs LLC, 556 F. Supp. 3d 222, 255 (S.D.N.Y. 2021).

To succeed on a claim of trade secret misappropriation under New York law, a plaintiff

must show (1) he "possessed a trade secret," and (2) defendants "used that trade secret in breach

of an agreement, confidential relationship or duty, or as a result of discovery by improper

means."  N. Atl. Instruments, Inc., v. Haber, 188 F.3d 38, 43–44 (2d Cir. 1999).  New York

courts consider the following factors to determine whether information constitutes a trade secret:

> (1) the extent to which the information is known outside of the
> business; (2) the extent to which it is known by employees and
> others involved in the business; (3) the extent of measures taken by
> the business to guard the secrecy of the information; (4) the value of
> the information to the business and its competitors; (5) the amount
> of effort or money expended by the business in developing the
> information; (6) the ease or difficulty with which the information
> could be properly acquired or duplicated by others.

Next Commc'ns, Inc. v. Viber Media, Inc., 2017 WL 4402540, at *4 (S.D.N.Y. Sept. 30, 2017),

aff'd, 758 F. App'x 46 (2d Cir. 2018) (citing Restatement (First) of Torts § 757).  As the

elements of a misappropriation of trade secrets claim under New York law are "fundamentally

the same" as a DTSA claim, this Court will consider the claims in tandem.  Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d at 395.

Although "[t]he existence . . . of a trade secret is usually treated as a question of fact, . . . summary judgment may be appropriate where it is clear that the information at issue is not actually secret or there is no discernible economic value from that information not being generally known."  Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d at 384.  "To survive summary judgment, a plaintiff asserting trade secret misappropriation must provide credible evidence that the trade secret exists and is ascertainable."  Medidata Sol., Inc. v. Veeva Sys., Inc., 2021 WL 467110, at *3.

        2.    Application

        a.    Timeliness

As a threshold matter, defendants contend plaintiff's claims are time-barred because the three-year statutes of limitations have run on plaintiff's federal and state law claims.  Specifically, defendants argue that plaintiff believed defendants were stealing his trade secrets as early as 2016 but failed to file suit until March 2021.

The Court disagrees.

Under the DTSA and New York common law, the statute of limitations for a misappropriation claim is three years.  See 18 U.S.C. § 1836(d); N.Y. C.P.L.R. § 214(4); Zirvi v. Flatley, 433 F. Supp. 3d 448, 460 (S.D.N.Y. 2020).  Under the DTSA, the limitations period runs from the date plaintiff discovered defendants' alleged misappropriation or could have discovered it with reasonable diligence.  18 U.S.C. § 1836(d).  "In other words, the limitations period begins to run when the plaintiff knew or should have known that the alleged trade secrets were wrongfully acquired, disclosed, or used."  Espire Ads LLC v. TAPP Influences Corp., 655 F.

24

Supp. 3d 223, 252 (S.D.N.Y. 2023).  Under New York common law, the limitations period runs

from "either when defendant discloses the trade secret or when he first makes use of plaintiff's

ideas."  My Mavens, LLC v. Grubhub, Inc., 2023 WL 5237519, *33 (S.D.N.Y. Aug. 14, 2023).

     Although defendants contend plaintiff discovered defendants' alleged misappropriation

in 2016, plaintiff distinguishes the moment he suspected individual IBM employees were "taking

credit" for plaintiff's ideas from the period when he suspected that IBM was misappropriating

his trade secret and incorporating it into its products.  (Doc. #265 at 9).  Plaintiff contends he did

not learn of IBM's misappropriation until 2019, when the Cloud Pak products that allegedly

incorporated his trade secret were released.  (Id. at 6).  Because of IBM's alleged efforts to

exclude plaintiff from these product developments, plaintiff argues he could not have known

about the misappropriation until these products entered the market.  See, e.g., Uni-Sys., LLC v.

United States Tennis Ass'n, Inc., 350 F. Supp. 3d 143, 178 (E.D.N.Y. 2018) (finding DTSA

claim timely because plaintiff did not discover alleged misappropriation until he reviewed an

architectural blueprint made by defendants).  Plaintiff's contentions that he did not discover the

alleged misappropriation until 2019 are sufficient to create a genuine issue of material fact as to

whether the statutes of limitations have run on his federal and state law claims.

     Accordingly, a grant of summary judgment on plaintiff's trade secret claims on

timeliness grounds would be inappropriate.

b.    <u>Specificity</u>

     Moving to the merits, the Court finds that plaintiff has failed to define his purported trade

secret with the requisite specificity.  Accordingly, there is no genuine issue of material fact that

plaintiff does not possess a trade secret.

25

Case 7:21-cv-02485-VB-JCM    Document 305    Filed 06/17/25    Page 26 of 53

To prevail on a claim of misappropriation of trade secrets under the DTSA and New York law, a party "must describe the alleged trade secret with adequate specificity to inform the defendants what [they are] alleged to have appropriated." Town & Country Linen Corp. v. Ingenious Designs LLC, 556 F. Supp. 3d at 270. This specificity requirement is "essential to trade secret law," id., and exists "for the simple reason that a defendant must know what constitutes a plaintiff's trade secret, so that it does not infringe upon that trade secret and so that the defendant can defend itself at any trial." Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014). Similarly, specificity is required because, without it, the trier of fact would not "be able to distinguish information which is protectable as a trade secret from that which does not give rise to a claim of trade secret misappropriation." Town & Country Linen Corp. v. Ingenious Designs LLC, 556 F. Supp. 3d at 270.[4]

To survive summary judgment, a party asserting a trade secret must describe the secret with "precision." Next Commc'ns, Inc. v. Viber Media, Inc., 2017 WL 4402540, at *4. "[V]ague and indefinite" definitions will not suffice. Heyman v. AR. Winarick, Inc., 325 F.2d 584, 590 (2d Cir. 1963).

i.    Plaintiff's Identification of His Alleged Trade Secret

Far from satisfying his burden to describe his alleged trade secret with precision, plaintiff instead equivocates in nearly every respect when discussing his alleged secret. This obfuscation is fatal to his claims.

---

[4]    Though the Second Circuit "has not squarely articulated the precise contours of the specificity requirement in the context of trade secrets," Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 800 n.9 (2d Cir. 2023), "there is no reason to believe that it would permit a party to advance a trade secret claim in vague and ambiguous terms." Sit-Up Ltd. v. IAC/InterActiveCorp., 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008).

To start, plaintiff equivocates as to whether one or multiple of his trade secrets were allegedly misappropriated by defendants.  Plaintiff describes his trade secret as "an advanced business decision-making, analytic, and marketing methodology" (Doc. #4 ("Am. Compl.") ¶ 40), that "construct[s] an architecture for a digital platform for the hybrid cloud" that enables "a bank or other company to access data its workflows rely upon wherever it resides without copying and to apply analytics to that data to make predictions and decisions in real time."  (Doc. #265 at 18; see also Am. Compl. ¶ 48 (describing the trade secret as "an analytical and marketing framework")).

Yet plaintiff is not consistent in referring to this purported trade secret.  At different times, he describes his trade secret as "an architecture" (Doc. #265 at 18), "a combination of software, hardware and other elements" (Doc. #281 ¶ 5), and "a methodology to construct an architecture for a digital platform."  (Doc. #265 at 18).  Broadly construed, plaintiff's purported trade secret is a methodology for creating the software architecture of a centralized platform that integrates traditionally siloed information and is updated in real time.  In plaintiff's own words, this alleged trade secret is "revolutionary" because of "the way in which A2E combines elements of the architectures it describes and provides a unique analytic, decision making process and marketing framework."  (Doc. #279 at ¶ 36).

ii.     The Elements of Plaintiff's Alleged Trade Secret

Beyond failing adequately to describe his claimed trade secret as a whole, plaintiff does not sufficiently identify the individual elements of his alleged secret.

"It is well-established that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable

secret." Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 174 (2d Cir. 1990). "A plaintiff asserting a combination trade secret must demonstrate that the way in which the publicly-available components fit together is unique and not publicly-known." Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d at 271.

Plaintiff does not, however, allege a trade secret that clearly and coherently identifies a combination of components that together form a protected process. For example, plaintiff alleges defendants misappropriated A2E under the DTSA, and misappropriated both A2E and "its derivative, Efficiency, Effectiveness, Real Time" ("EERT") under New York law. (Am. Compl. ¶¶ 5, 226, 234). Plaintiff defines A2E as "an advanced methodology" and EERT as "a measurement rubric" that is a "derivative" of A2E which measures the "efficiencies generated by implementing" A2E. (Id. ¶¶ 5, 220–22). However, plaintiff confusingly refers to A2E and EERT "collectively" as A2E. (Id. ¶ 236). And despite referring to, in passing, the "wholly new and unique" character of the individual elements that comprise his trade secret, plaintiff does not contend explicitly that these "specific components" are themselves individual trade secrets. (Id.).

It is therefore unclear whether plaintiff's trade secret[s] consist of A2E alone, A2E and EERT, A2E and its individual elements, or something else altogether. By means of explanation, plaintiff contends he "uses the singular and plural form interchangeably to describe his trade secret" and states that "it is one trade secret with many components." (Doc. #279 ¶ 40). For purposes of this motion, the Court will construe plaintiff's claim as seeking protection for an individual trade secret—A2E—because this most closely hews to plaintiff's narrative description of the secret as "an advanced business decision-making, analytic, and marketing methodology."

(Am Compl. ¶ 40).  However, the Court observes that plaintiff's allegations are marked at the outset by a lack of precision.

Further, although plaintiff extols the supposed revolutionary benefits of his trade secret, he fails to provide either a definitive list of the elements of A2E or explain how they work together in a unique manner, as is required for a combination trade secret.  Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d at 271.  In one set of interrogatory responses, plaintiff describes A2E as using five "unique features (or combination of features)" (Doc. #298-3 ¶ 38), and refers to its use of a "novel five-step process."  (Id. ¶ 36).  In another set of responses, however, he identifies four or five "[k]ey elements" and 26 "other" elements of A2E.  (Id. at 5– 8).  Some of these "additional" elements appear duplicative of the "key" elements or merely descriptive of the entire alleged trade secret itself.

This is not sufficient as a matter of law.  Not only does plaintiff fail to define the exact elements that comprise his trade secret, but he also fails to explain how these various components combine to form a trade secret.  To the contrary, plaintiff argues that multiple "combinations of elements of his A2E" were misappropriated, suggesting that the alleged trade secret is any combination of elements from a yet-to-be-defined list.  (Doc. #265 at 19).  But a purported trade secret that incorporates "a wide variety" of elements and potential combinations does not satisfy the specificity requirement.   Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d at 265 (holding that an alleged trade secret was not sufficiently specific because it "implicate[d] varying structure compositions, a variety of different additives in differing concentrations, an enormous range of Entira amounts, and a wide variety of substrates and finishing treatments").

Here, plaintiff has offered no concrete evidence that his business methodology "uniquely str[ings] together certain elements in a particular way."  Sit-Up Ltd. v. IAC/InterActiveCorp., 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008).  Instead, plaintiff invites the Court to conclude that, due to plaintiff's "35 years of experience in the financial services sector" (Doc. #267 ¶ 1), his "combination of various, possibly secret, data and business protocols" to create A2E "must have been unique."  Sit-Up Ltd. v. IAC/InterActiveCorp., 2008 WL 463884, at *10. Such assumptions and logical leaps are no substitute for evidence that demonstrates A2E is a protectable trade secret.

In lieu of such evidence, plaintiff makes repeated and conclusory allegations that he has defined A2E with the requisite specificity to render it a protectable trade secret.  (See Doc. #265 at 19 (arguing that plaintiff "has laid out in detail. . . which specific elements and combinations of elements of his A2E . . . he claims to be infringed" by defendants); Am. Compl. ¶ 236 ("There is no question but that A2E and EERT (collectively, 'A2E') constitute trade secrets.")).  Yet "[r]epetition alone cannot make it so," especially when, as here, plaintiff has not defined—with any sort of specificity—either the elements or the combination of elements that render A2E unique.  Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d at 271.

In what appears to be an effort to distract from his imprecision, plaintiff gestures to numerous documents he alleges describe his trade secret—or, at least, most of the secret.  But plaintiff's efforts to define his alleged trade secret by referring to a set of documents only muddy the waters further.  For example, plaintiff contends that "all of the elements of his trade secrets and confidential IP which he claims were misappropriated" are summarized in a May 2011 slide deck entitled "From Awareness to Execution (A2E)".  (Doc. #262-31 at 24–25).  Yet, in the next sentence, plaintiff also admits that "other aspects of his trade secret" were developed after May

30

2011 and "deliberately" undisclosed so plaintiff could prevent others from executing on his trade

secret.  (Doc #262-31 at 25).  In a similar vein, plaintiff states his "trade secrets are described

and explained" in the What, Why, and How Paper, but later testifies that this whitepaper

discloses only the "what," not the "how," of the trade secret.  (Doc. #262-11 at 390:17–24).

Indeed, plaintiff asserts that these documents themselves are insufficient to understanding the

"how" of his trade secret—to fully understand the trade secret, a four-hour presentation delivered

by plaintiff, together with the aforementioned indefinite collection of documents, is required.

(See Doc. #262-11 at 397:11–14, 541:23–542:4).

  This disclosure of the "complete documentation" of a purported secret without

identifying "exactly which pieces of information are the trade secrets" is prohibited.  Big Vision

Priv. Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d at 263.  A plaintiff "must do more

than just identify a kind of technology and then invite the court to hunt through the details in

search of items meeting the statutory definition."  Id. at 263–64.  In citing such a range of

documents that purportedly define his trade secret, plaintiff "impermissibly shifts [his] burden"

onto defendants and the Court to comb through his papers and attempt to find it.  Id. at 263.

Plaintiff presents an active—and prohibited—moving target when it comes to defining his trade

secret by referring to relevant documents.  Although dispersing the definition of his trade secret

among various documents and obfuscating which sources describe the trade secret may have

been an effective means—in plaintiff's mind—of protecting his secret from potential

competitors, plaintiff's elusive tactics are fatal to his misappropriation claims.

  Moreover, even if the Court were able to ascertain which documents adequately

described plaintiff's trade secret, the documents themselves are not illuminating.  The slide decks

and whitepapers to which plaintiff refers consist of "vague descriptions and rudimentary graphics

and concepts" that "neither describe trade secrets with particularity nor explain how various components fit together to form compilation trade secrets." Next Commc'ns, Inc. v. Viber Media, Inc., 2017 WL 4402540, at *5. They describe such "vague labels" and "high-level concepts" such as the importance of "becoming aware of an opportunity/risk" and then "analyz[ing] the personal implications" (Doc. #264-29 at 6), "mov[ing] Human Capital Activity from Low Value Transactional activities to High Value Interactions" (Doc. #264-28 at 31), and the importance of becoming "real time customer centric." (Doc. #264-26 at 7).

Yet "[t]he accumulation of icons and arrows [in these documents] fails to convey any information about the logical relationship between the operations, data structures, and software [plaintiff] alleges combine to form a trade secret." Next Commc'ns, Inc. v. Viber Media, Inc., 758 F. App'x 46, 49 (2d Cir. 2018). If anything, these documents tend to speak more to the benefits and commercial motivations that drive plaintiff's trade secret, rather than the definition of the secret itself. Although these documents extol the potential commercial advantages of a real-time analytical tool that can be applied to centralized data, they fail to explain how exactly the various operations, formulas, and concepts combine to form plaintiff's trade secret. This is insufficient for the specificity requirement, which requires the plaintiff to define with specificity the parameters of his alleged trade secret and how the elements fit together in a unique and advantageous way. After undergoing "massive document discovery," plaintiff cannot distract from his inability to define his trade secret with precision by referring the Court to a stack of documents and arguing that the trade secret is adequately defined therein. Sit-Up Ltd. v. IAC/InterActiveCorp., 2008 WL 463884, at *5, 9.

32

iii.      Defendants' Ability to Defend Against Plaintiff's Claim

Plaintiff's lack of specificity also leaves defendants unable to defend adequately against his allegations.  Plaintiff argues he has described his trade secret with sufficient specificity because numerous IBM colleagues recognized the potential value of A2E.  (Doc. #265 at 19–20).  Yet plaintiff's circular arguments illustrate the contradictions inherent in his allegations, and he cannot avoid his obligation to describe the alleged trade secret with specificity by arguing that other colleagues' reactions to his presentations necessarily mean he possesses a trade secret.

In addition, plaintiff argues defendants are "clearly in a position to defend" against his claims because a defense expert conceded that defendants' Cloud Pak products "have many of the elements and capabilities [plaintiff] alleges are in A2E."  (Doc. #265 at 19).  However, throughout this litigation, plaintiff consistently refers to his trade secret as a "combination" of elements.  When pressed to define the "unified process, design, and operation" that render this combination "unique," Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d at 174, plaintiff cannot avoid this burden by claiming that the individual elements are the actual trade secrets misappropriated by defendants.

Further, without an "affirmative disclosure or description," defendants have "no way of knowing which structure or structures," or which combination of elements, comprise plaintiff's trade secret.  Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d at 260 (emphasis in original).  Such a lack of specificity would render defendants vulnerable to allegations of misappropriating undefined combinations of undefined elements—which is exactly what plaintiff alleges here.

Even if the Court were to construe plaintiff's claims as alleging that each individual element of A2E is a trade secret—which plaintiff explicitly fails to do—these individual

33

elements cannot be trade secrets because they are generic and publicly known.  "Information that

is public knowledge or that is generally known in an industry cannot be a trade secret."

Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984).  Plaintiff identifies elements of A2E

that include, among other things, the integration of "[w]orkflows in different silos and

domains," "[u]sing automation, Big Data Analytics, and integration of workflows to move

human capital from low to high value work," and partnering with other companies "rather than

attempt to create tech yourself and compete with them."  (Doc. #264-31 at 6–7).  Plaintiff also

describes a "novel five step process" that includes "Awareness, Analysis, Collaboration,

Decision, and Execution."  (Id. at 4).  These components constitute generic and vague references

to basic efficiency measures that are generally known and easily ascertainable.  See Speedry

Chem. Prod., Inc., v. Carter's Ink Co., 306 F.2d 328, 331 (2d Cir. 1962) ("Matters . . . of general

knowledge in an industry cannot be appropriated by one as his secret.").  Therefore, the

individual elements of A2E that plaintiff has identified cannot be trade secrets.

        In essence, plaintiff appears to "conflate[] the concept of a trade secret with confidential

information," Elsevier Inc. v. Doctor Evidence, LLC, 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23,

2018), as is evidenced by his repeated reference to "his confidential IP."  (Doc. #262-31 at 25).

However, "[g]eneral allegations regarding confidential information and processes" are

insufficient to support a trade secrets claim.  Elsevier Inc. v. Doctor Evidence, LLC, 2018 WL

557906, at *6; see also id. ("[C]onfidential information is not the same as a trade secret.").

Similarly, plaintiff makes much of the fact that employees at IBM and potential clients, including

executives, allegedly expressed interest in A2E, some even "visibly shaking" after meeting with

plaintiff and his BaaP team colleagues.  (Doc. #270 ¶ 28).  Even when construing all facts in

plaintiff's favor, the alleged excitement of other people regarding A2E neither displaces

plaintiff's burden to define his alleged trade secret with adequate specificity nor distracts from his failure to do so.

It may well be that plaintiff's misappropriation claims would have survived a motion to dismiss, because "[a]t the pleading stage, specificity as to the precise trade secrets misappropriated is not required." Next Commc'ns, Inc. v. Viber Media, Inc., 2017 WL 4402540, at *4. "In order to survive summary judgment, however, the plaintiff must describe the secrets with greater precision" and offer more than "vague and indefinite illustrations." Id. For the foregoing reasons, plaintiff fails to do so.

Accordingly, because plaintiff fails to meet his burden to define his trade secret with the requisite specificity, the Court concludes that plaintiff does not have a protectable trade secret.

          c.      Secrecy

Even if plaintiff had identified a protectable trade secret, his misappropriation claims would still fail because there is no genuine issue of material fact that the alleged trade secret was, in fact, secret.

"[A] trade secret must first of all be secret." Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 407 (1993). "Although secrecy is a question of fact, courts have held that there can be no trade secret protection, as a matter of law, if the secrecy is necessarily lost when the design or product is placed on the market." LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 498 (S.D.N.Y. 2002). "[T]he primary consideration in determining secrecy is whether the information is easily ascertainable by the public." Id. at 499.

Courts in this Circuit have held that source code or technical details of a software architecture can be trade secrets if they are "not easily copied or ascertainable by inspection of the program." LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d at 499; see also Integrated Cash

35

Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d at 174 (affirming finding that a product architecture was a trade secret because it was not "readily ascertainable"); Q-Co Indus., Inc. v. Hoffman, 625 F. Supp. 608, 617 (S.D.N.Y. 1985) (finding that the source code for a computer software was likely a trade secret because it was "not accessible to the public").

But the architecture or design of a software system that is "obvious" or "easily duplicated" once it is seen by the public cannot, as a matter of law, constitute a trade secret. LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d at 499. This is because, like the blueprint of a building, once the software architecture is implemented into a marketable product, and that product is placed on the market, "the system's architecture will become obvious and easily duplicated." Id.; see also My Mavens, LLC v. Grubhub, Inc., 2023 WL 5237519, at *20 (dismissing misappropriation claim because unexecuted marketing concept to offer discounts and website filters, once implemented into a marketed product, would have been "obvious and easily duplicated").

Here, plaintiff's alleged trade secret is "not the source code . . . or even the technical details regarding how the different programs will interact with one another" within a system architecture. Scienton Techs., Inc. v. Computer Assocs. Int'l Inc., 2012 WL 13105453, at *11. Instead, A2E is an unexecuted "methodology to construct an architecture for a digital platform." (Doc. #265 at 18). Plaintiff's alleged trade secret is an "idea to create a [software] solution" that would involve combining "unrelated computer programs and software functionalities." Scienton Techs., Inc. v. Computer Assocs. Int'l Inc., 2012 WL 13105453, at *11. Once this idea was implemented to create an actual platform that hit the market, however, "this information would have become obvious and easy to ascertain." Id. In other words, once plaintiff's idea for a hybrid cloud platform that centralized siloed information to enable banks to make decisions

about a certain customer was put into effect, the idea itself would become obvious on its face. The technical methods or code underlying this particular platform might not be public and obvious, but the underlying idea—which is the essence of plaintiff's trade secret—would be clear and easy to ascertain. Therefore, because "the secrecy is necessarily lost when the design or product is placed on the market," plaintiff's alleged trade secret is not entitled to trade secret protection. LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d at 498.

Moreover, "courts have distinguished between publically available advertising ideas, and the private technology developed to execute the ideas." Sarkissian Mason, Inc. v. Enter. Holdings, Inc., 955 F. Supp. 2d 247, 256 (S.D.N.Y. 2013); see also Boyle v. Stephens, Inc., 1997 WL 529006, at *4 (S.D.N.Y. Aug. 26, 1997), aff'd, 21 F. App'x 76 (2d Cir. 2001) (observing a trade secret "does not include a marketing concept or new product idea"); LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d at 499–500 ("It is well-established that marketing concepts and new product ideas are not considered trade secrets."). At no point does plaintiff allege A2E is an executed methodology. As such, plaintiff's "proposal never progressed beyond a marketing concept," and plaintiff "never developed the technology or logistics to implement the program, which at that later stage might have qualified as a trade secret." Sarkissian Mason, Inc. v. Enter. Holdings, Inc., 955 F. Supp. 2d at 256.

Plaintiff contends secrecy is a question of fact and that he has taken reasonable measures to protect his trade secret, but that argument is ultimately unavailing. Doc. #265 at 7. "[T]o defeat a motion for summary judgment, a plaintiff need only point to evidence of protective measures, and then it becomes the jury's task to evaluate whether they were reasonable." Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d at 385. It is undisputed that plaintiff sometimes labeled relevant documents pertaining to A2E with confidential markings. Plaintiff

also contends his documents were covered either by existing NDAs between the potential clients and IBM—although he admits to never having seen these NDAs—or by NDAs between the potential clients and one of plaintiff's former employers.  (Doc. #279 ¶¶ 124, 128, 130, 133, 140, 143, 145).  Moreover, according to plaintiff, these documents did not disclose the entirety of A2E but only described A2E at a "high level."  (Id. ¶ 131).

Although plaintiff is correct that whether he took reasonable measures is a "highly fact-intensive issue and therefore ordinarily a question for the jury" (Doc. #265 at 7), his evidence of reasonable measures cannot defeat the fact that his idea for a "system architecture," LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d at 499—that is, a methodology to build a centralized platform that integrates siloed information—cannot rise to the level of a trade secret as a matter of law, which renders plaintiff's efforts to protect this methodology inapposite.  Plaintiff's "description" of A2E's elements "suggests that these elements may be nothing more than an amalgamation of business concepts, strategies, and ideas to be used in the eventual construction of a marketable computer software program."  Id. at 500.  Yet "information consisting simply of business possibilities or goals is not a trade secret."  Id.  Therefore, regardless of plaintiff's evidence of reasonable measures to maintain A2E's secrecy, such evidence is meaningless here where a protectable trade secret does not exist.

Because the Court concludes plaintiff did not possess a trade secret, it need not consider whether defendants misappropriated the alleged trade secret "in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means."  Pauwels v. Deloitte LLP, 2020 WL 818742, at *8 (S.D.N.Y. Feb. 19, 2020).

In sum, defendants are entitled to summary judgment on plaintiff's federal and state law misappropriation of trade secrets claims.

C.    Breach of Contract Claim (Count III)

Defendants next contend plaintiff's breach of contract claim fails because the ARCIIP does not require defendants to protect the confidentiality of plaintiff's alleged trade secret.

The Court agrees.

"To prevail on a breach of contract claim under New York law, a plaintiff must show that (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant[s] breached [their] contractual obligations; and (4) defendant[s'] breach resulted in damages." Martinez v. Agway Energy Servs., LLC, 88 F.4th 401, 409 (2d Cir. 2023). "Summary judgment on a contract claim is appropriate only when the contractual language is found to be wholly unambiguous and to convey a definite meaning." Id.

"Whether a contract is ambiguous is a question of law for the court to decide." Evolution Markets, Inc. v. Alpental Energy Partners, LLC, 221 F. Supp. 3d 361, 369 (S.D.N.Y. 2016). "A contact is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Ergowerx Intern., LLC v. Maxell Corp. of America, 18 F. Supp. 3d 430, 440 (S.D.N.Y. 2014).

The ARCIIP is an agreement between IBM and the company's at-will employees, which plaintiff signed upon beginning his employment at IBM in 2015. The first term of the contract states in part:

> I will not, without IBM's prior written permission, disclose to anyone outside of IBM or use in other than IBM's business, either during or after my employment, any confidential information or material of IBM, or any information or material received by IBM in confidence from third parties, such as suppliers or customers.

(ARCIIP ¶ 1).

The third term of the ARCIIP states:

> I will not disclose to IBM, use in its business, or cause it to use, any information or material which is confidential to any third party unless authorized by IBM.  In addition, I will not incorporate into any product used and/or sold by IBM, any copyrighted materials or patented inventions of any third party, unless authorized by IBM.

(ARCIIP ¶ 3).

The ARCIIP also assigns to IBM "any idea, concept, technique . . . [or] design" (called "Developments") that an employee creates related to IBM's business and allows employees to identify any Developments they do not assign "which were previously made or conceived solely or jointly by me . . . but neither published nor filed in any patent office."  (ARCIIP ¶¶ 5, 8).  As stated in the ARCIIP, employees who wish to "interest IBM" in these unassigned Developments are directed to contact the Intellectual Property and Licensing Department at Corporate Headquarters.  (Id. at ECF 3).  Finally, the ARCIIP states that the ARCIIP "supersedes all previous oral or written communications," and that any amendments may only be made in writing signed by the parties.  (ARCIIP ¶ 12).

Here, the clear, unambiguous language of the ARCIIP obliges employees to keep IBM's information confidential, assigns to IBM any intellectual property an employee creates during their employment, and enables employees to identify Developments that were created prior to their employment which they do not wish to assign.  There is nothing in the ARCIIP that obliges IBM to keep an employee's proprietary information confidential, as plaintiff argues.  Moreover, employees in possession of proprietary information are directed to contact the licensing department, which plaintiff did not do.[5]

---

[5]    Although plaintiff identified A2E and EERT as his intellectual property exempted from the ARCIIP's assignment provision (see ARCIIP ¶ 8), plaintiff's failure to contact the licensing department renders his identification of his intellectual property inapposite.  Moreover, the fact that plaintiff listed A2E and EERT on the ARCIIP does not change the fact that the ARCIIP obliges employees to keep IBM's intellectual property confidential, not the other way around.

Plaintiff contends an unidentified human resources representative verbally informed him that the ARCIIP prohibited IBM from using or disclosing any unassigned intellectual property. (See Doc. #264-23 at 112:9–18).  But this purported evidence cannot overcome the contract's integration clause (ARCIIP ¶ 12), which bars the consideration of extrinsic evidence.  See Volt Elec. NYC Corp. v. A.M.E., Inc., 586 F. Supp. 3d 262, 281 (S.D.N.Y. 2022) (holding that an integration clause in a contract "bar[s] the introduction of extrinsic evidence to vary or contradict the terms of the writing").  Regardless of how plaintiff chose to interpret the ARCIIP, the clear terms of the agreement foreclose his attempts to undermine its terms.

Despite the contract's definite and precise terms, plaintiff seems to argue that the ARCIIP's prohibition on the disclosure to IBM of "any information or material which is confidential to any third party" applies to A2E, suggesting that plaintiff himself is a "third party" for purposes of the contract and that various IBM employees violated their ARCIIP agreements with IBM when they shared plaintiff's alleged trade secret.  (Doc. #265 at 25).  Plaintiff also tags IBM with this alleged contractual violation based on agency principles.  (Id. at 25–26).

Plaintiff's argument fails for several reasons.  First, the term "third party" in the ARCIIP "cannot plausibly be read to refer to other employees of [IBM]."  Zebra Strategies, Inc. v. Gonzalez-Nazario, 2025 WL 353411, at *10 (S.D.N.Y. Jan. 31, 2025).  In a separate provision of the ARCIIP that prohibits the disclosure of IBM's confidential information to third parties, the term "third party" is defined as "suppliers or customers."  (ARCIIP ¶ 1).  Thus, "third party" in the ARCIIP is more reasonably understood to mean individuals not employed at IBM or otherwise outside of the company.  In addition, plaintiff has adduced no evidence of any agreements, including ARCIIPs, between IBM and the employees at issue.

41

Moreover, even if plaintiff could be considered a "third party" for the purposes of the ARCIIP, he has put forth no evidence of the existence of an agency relationship between IBM and the employees accused of stealing plaintiff's alleged trade secret sufficient to impart liability to IBM. A "principal is liable only for the conduct of an agent acting within the scope of his actual or apparent authority." Kwon v. Yun, 606 F. Supp. 2d 344, 362 (S.D.N.Y. 2009). Here, apart from his conclusory assertion that the alleged theft of his trade secret by IBM employees "implicates IBM as well" (Doc. #265 at 25), plaintiff has adduced no evidence (i) identifying the specific IBM employees who allegedly stole plaintiff's trade secret or (ii) showing that this unidentified group of IBM employees acted within their authority when they allegedly stole plaintiff's trade secret. Plaintiff's failure on both prongs is fatal to his breach of contract claim.

Because the unambiguous terms of the ARCIIP do not require IBM to keep an employee's proprietary information confidential, there is no genuine issue of material fact as to whether defendants breached the ARCIIP. Accordingly, defendants are entitled to summary judgment on plaintiff's breach of contract claim.

D.    Breach of the Implied Covenant of Good Faith and Fair Dealing Claim (Count IV)

Defendants contend that, because plaintiff's breach of contract claim fails, his claim for breach of the implied covenant of good faith and fair dealing must also fail.

The Court agrees.

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." WCA Holdings III, LLC v. Panasonic Avionics Corp., 704 F. Supp. 3d 473, 498 (S.D.N.Y. 2023). As a result, New York law "does not recognize a separate cause of action for breach of the implied

covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002).

Here, because plaintiff pled a breach of contract claim, his separate claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.

Accordingly, defendants are entitled to summary judgment on plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

E.    Unjust Enrichment Claim (Count V)

Defendants contend plaintiff's unjust enrichment claim fails because it rises and falls with his misappropriation claim.

Although this is a close call, the Court disagrees.

"To prevail on an unjust enrichment claim under New York law, a plaintiff must show that (1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff." In re Gen. Motors LLC Ignition Switch Litig., 257 F. Supp. 3d 372, 433 (S.D.N.Y. 2017). "[A] plaintiff's claim for unjust enrichment does not necessarily rise or fall with a claim of trade secret misappropriation." Pauwels v. Deloitte LLP, 83 F.4th 171, 187 (2d Cir. 2023). "[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." In re Gen. Motors LLC Ignition Switch Litig., 257 F. Supp. 3d at 433.

Defendants contend plaintiff's unjust enrichment claim must be dismissed because it is based on the same allegations as his trade secret misappropriation claims. (Doc. #260 at 28). Yet not only does an unjust enrichment claim not rise and fall with a misappropriation claim, see Pauwels v. Deloitte LLP, 83 F.4th at 187, plaintiff's allegations underlying this claim are

different than the allegations underlying his misappropriation claims.  The "crux" of plaintiff's unjust enrichment claim is that defendants hired and "compensated him solely for his [subject matter expertise]," but that defendants "took more than what [they] bargained for" when they misappropriated and repurposed plaintiff's A2E methodology into their own product offerings. Pauwels v. Deloitte LLP, 83 F.4th at 187.  "Because this theory of liability is distinct from those underpinning [plaintiff's] claim for trade secret misappropriation," plaintiff's claim for unjust enrichment is not duplicative of his trade secret misappropriation claim.  Id. at 187.

Moreover, plaintiff's unjust enrichment claim does not arise from the same subject matter as that which is governed by the ARCIIP.  As defendants argue, the ARCIIP governs the protection of IBM's—and not plaintiff's—intellectual property.  (Doc. #260 at 16).  Therefore, plaintiff's claim that defendants misled him as to the nature of his employment and stole his intellectual property does not fall under the purview of the ARCIIP.  (Doc. #260 at 16–17; see also In re Coudert Bros., 487 B.R. 375, 396–97 (S.D.N.Y. 2013) (holding that unjust enrichment claim was not barred by the Court's earlier finding, in defendants' favor, that the contract unambiguously did not reach the subject matter of the unjust enrichment claim)).  Moreover, there are no other documents or agreements that govern plaintiff's employment with IBM.  See, e.g., Downey v. Adloox Inc., 238 F. Supp. 3d 514, 526 (S.D.N.Y. 2017) (dismissing unjust enrichment claim that defendants "appropriated" plaintiff's marketing and sales techniques because it was governed by plaintiff's employment contract with defendants).  Thus, as this dispute is not governed by an existing contract, plaintiff is not precluded from recovering on this claim.

Accordingly, because genuine issues of material fact exist as to plaintiff's unjust enrichment claim, defendants' motion for summary judgment on this claim is denied.

F.     Tortious Interference Claim (Count VI)

Defendants contend plaintiff's tortious interference claim fails as a matter of law.

The Court agrees.

To prevail on a claim of tortious interference with prospective economic advantage, "a plaintiff must show that (1) it had a business relationship with a third party, (2) the defendant knew of and intentionally interfered with that relationship, (3) the defendant's interference amounts to wrongful means, and (4) the defendant's interference caused injury to the relationship." Friedman v. Coldwater Creek, Inc., 551 F. Supp. 2d 164, 169 (S.D.N.Y. 2008). "[A] claim for interference with advantageous business relationships must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior." Kramer v. Pollock-Krasner Foundation, 890 F. Supp. 250, 258 (S.D.N.Y. 1995).

Plaintiffs "may not sue for interference with business relations between a third party and the plaintiff's employer," Henneberry v. Sumitomo Corp. of America, 415 F. Supp. 2d 423, 466 (S.D.N.Y. 2006), because "business relationships with the employer's customer belong to the employer, not the employee." Cumisky v. James River Corp., 1995 WL 520021, at *4 (E.D.N.Y. Aug. 17, 1995). Moreover, "the defendant's conduct must amount to a crime or an independent tort" to support a tortious interference with prospective economic advantage claim. Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004).

Plaintiff argues that IBM interfered with IBM's contracts with various prospective clients and thereby deprived plaintiff of associated compensation and bonuses. But plaintiff cannot challenge defendant IBM's alleged interference because the business relationships with those prospective clients belonged to IBM, not to plaintiff. See Frishberg v. Esprit de Corp., 778 F.

45

Supp. 793, 804 (S.D.N.Y. 1991).  Defendant IBM's alleged interference in "plaintiff['s] ability

to sell [defendant's] goods to certain accounts cannot be tortious interference" because plaintiff

was an employee of IBM and had "no independent right to sell" IBM's products or services.  Id.

Moreover, even if plaintiff's relationships with prospective clients belonged to him, and not to

IBM, he has not shown that defendants' conduct amounted to a crime or tort.  See Carvel Corp.

v. Noonan, 3 N.Y.3d at 190.

Accordingly, defendants are entitled to summary judgment on plaintiff's tortious

interference claim.

G.    Retaliatory Discharge Claim (Count VII)

Finally, defendants contend plaintiff's retaliatory discharge claim under the Sarbanes-

Oxley Act fails because he did not engage in protected activity and has failed to show his alleged

complaints were the cause of his termination.

The Court disagrees.

1.    Legal Standard

The Sarbanes-Oxley Act provides protections to "all employees who report misconduct

to the Securities and Exchange Commission (SEC or Commission), any other federal agency,

Congress, or an internal supervisor."  Digital Realty Tr., Inc. v. Somers, 583 U.S. 149, 149

(2018); 18 U.S.C. § 1514A(a)(1).  To make a prima facie showing of retaliatory discrimination, a

plaintiff must show "(1) he or she engaged in a protected activity; (2) the employer knew that he

or she engaged in the protected activity; (3) he or she suffered an unfavorable personnel action;

and (4) the protected activity was a contributing factor in the unfavorable action."  Bechtel v.

Admin. Review Bd., 710 F.3d 443, 451 (2d Cir. 2013).  A plaintiff's activity is protected if "he

(1) provides information, (2) regarding any conduct which the employee reasonably believes

constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or

1348 [securities and commodities fraud], any rule or regulation of the Securities and Exchange

Commission, or any provision of Federal law relating to fraud against shareholders, to (3) a

federal agency, Congress, or a person with supervisory authority over the employee." Leshinsky

v. Telvent GIT, S.A., 942 F. Supp. 2d 432, 441–42 (S.D.N.Y. 2013).

Courts employ a burden-shifting framework to assess retaliation claims under the

Sarbanes-Oxley Act.  First, a plaintiff bears the initial burden of making a prima facie showing

of retaliation.  Murray v. UBS Securities, LLC, 601 U.S. 23, 26 (2024).  If the plaintiff makes

such a showing, the burden then shifts to the defendant to prove "by clear and convincing

evidence that it would have taken the same unfavorable personnel action in the absence of the

protected behavior."  Id. at 36.

"At the summary judgment stage, a plaintiff need only demonstrate that a rational

factfinder could determine that plaintiff has made his prima facie case."  Ashmore v. CGI Grp.

Inc., 138 F. Supp. 3d 329, 340 (S.D.N.Y. 2015).  "Assuming a plaintiff does so, summary

judgment is appropriate only when, construing all of the facts in the employee's favor, there is no

genuine dispute that the record clearly and convincingly demonstrates that the adverse action

would have been taken in the absence of the protected behavior."  Id. (emphasis in original).

Therefore, the defendant's burden under Sarbanes-Oxley is "notably greater than the burden

imposed by other federal employee protection statutes, making summary judgment against

plaintiffs in Sarbanes–Oxley retaliation cases a more difficult proposition."  Id. at 340–41.

A plaintiff asserting a Sarbanes-Oxley whistleblower claim must first exhaust his

administrative remedies by filing a complaint with the Secretary of Labor "not later than 180

days after the date on which the violation occurs."  18 U.S.C. § 1514A(b)(1)(A), (b)(2)(D).  The

Secretary of Labor, in turn, has delegated the responsibility for adjudicating Sarbanes-Oxley

whistleblower retaliation claims to the Occupational Safety and Health Administration

("OSHA").  29 C.F.R. § 1980.103(b)–(d); see also Daly v. Citigroup Inc., 939 F.3d 415, 427 (2d

Cir. 2019).  If the Secretary does not "issue a final decision on the claim within 180 days of the

filing of the complaint, and there is no showing that such delay is due to the bad faith of the

claimant," the claimant may file an action in federal court.  18 U.S.C. § 1514A(b)(1)(B).

    2.   Application

    a.   Exhaustion

As a threshold matter, the Court finds that plaintiff's retaliatory discharge claim is

properly exhausted.  See Daly v. Citigroup Inc., 939 F.3d at 427 (holding the administrative

exhaustion requirements in the Sarbanes-Oxley Act are jurisdictional).  As plaintiff was

terminated on October 31, 2018, and filed the OSHA Complaint on December 12, 2018, his

OSHA complaint was timely.  (Doc. #262-104 at 1).  By the time OSHA issued its findings and

dismissed the case at plaintiff's request on May 27, 2020, more than 180 days had elapsed since

the filing of the OSHA Complaint.  Therefore, plaintiff has properly exhausted his administrative

remedies for his retaliatory discharge claim as required by the statute.

As the Court may properly exercise jurisdiction, plaintiff has presented enough evidence

to create a genuine issue of material fact as to whether his termination was retaliatory, in

violation of Section 1514A.

    b.   Prima Facie Case

 Defendants contend plaintiff cannot make a prima facie showing of retaliation because

he did not engage in protected activity, fails to demonstrate defendants knew of any protected

activity, and fails to show the activity, if any, caused his termination.

The Court disagrees.

i.    Protected Activity

The Sarbanes-Oxley Act "extends whistleblower protection to information provided by an employee regarding any conduct which the employee reasonably believes constitutes a violation of the enumerated federal provisions." Nielsen v. AECOM Tech. Corp., 762 F.3d 214, 221 (2d Cir. 2014). As reasonable belief contains both subjective and objective components, a plaintiff "must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation." Ashmore v. CGI Croup Inc., 138 F. Supp. 3d at 341. "The objective prong of the reasonable belief test focuses on the basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience." Id. "As the inquiry focuses on the reasonableness of the employee's belief, the conduct about which the employee provides information need not have actually violated an enumerated provision." Id.

Here, plaintiff has presented sufficient evidence that he engaged in protected activity. In early 2018, plaintiff began to suspect that IBM was engaging in financial improprieties and misleading the markets about the company's profits. These alleged improprieties included price manipulation, "contract stuffing," whereby a customer's contract was "stuffed" with extraneous software to inflate profit numbers, and "revenue shifting," in which the profits from one transaction were improperly shifted to another. (Doc. #281 ¶¶ 90–91). Specifically, plaintiff alleges IBM was adding software from its Watson brand to existing customer contracts—even though the software was "virtually useless"—to "falsely inflate revenues." (Doc. #265 at 30).

Plaintiff contends he reasonably believed such activities violated federal wire fraud and mail fraud statutes and Exchange Act Rule 10b-5. (Doc. #265 at 29). According to plaintiff,

49

Bingham, and Gotlieb, plaintiff raised these concerns both orally and in writing to Andrud, the partner on some of the suspected transactions, and Andrud eventually reported these concerns to IBM's legal department.  (Doc. #270 ¶ 35; Doc. #271 ¶ 27–28).  Plaintiff claims he raised these issues to Andrud via email on March 29, 2018, and May 10, 2018, as well as in conversation.  (Doc. #264-23 at 268:6, 273:11–13).  Gotlieb and Bingham testified they had the same concerns and Gotlieb also reported his concerns to Andrud.  (Doc. #271 ¶ 28; Doc. #270 ¶ 35).  Shortly after plaintiff and Gotlieb reported these concerns to Andrud, plaintiff, Gotlieb, and Andrud were all terminated.  (Doc. #270 ¶ 35).

IBM does not dispute that reporting the alleged financial improprieties is protected activity within the purview of the Sarbanes-Oxley Act's retaliation provision.  Instead, IBM argues plaintiff's complaints amount only to "gripes about internal IBM decision-making" and that plaintiff fails to explain how or why these improprieties were illegal.  (Doc. #260 at 34).

Although plaintiff gives few bases for his subjective belief that IBM was engaging in accounting improprieties, the fact that other employees, including Bingham, Gotlieb, and Cohen, shared or similarly reported these concerns indicates that plaintiff's beliefs were based in part on his conversations with other employees.  See, e.g., Callahan v. HSBC Securities (USA) Inc., 723 F. Supp. 3d 315, 323–24 (S.D.N.Y. 2024) (holding that plaintiff's subjective beliefs were reasonably pled because they were based, inter alia, on "conversations with other employees").  Far from relying solely on his own testimony—which, in this regard, is "not contradictory or rife with inconsistencies such that it [is] facially implausible," Ashmore v. CGI Group Inc., 138 F. Supp. 3d at 342—plaintiff points to the testimony of several other IBM employees who shared plaintiff's concerns and similarly reported these concerns to their supervisors.  Although a jury

may choose not to credit plaintiff's, Bingham's, or Gotlieb's testimony, their narratives create a factual issue precluding summary judgment.

Defendants make much of the fact that plaintiff raised his concerns to Andrud and not to Suarez, plaintiff's supervisor, and contend that this forecloses the retaliation claim as Andrud did not have supervisory authority over plaintiff. But defendants' description of Andrud as a "co-worker" is unsupported by the record and their limited reading of the statute is unsupported by the case law. Rather, the Sarbanes-Oxley Act protects individuals who report information to "a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)." 18 U.S.C. § 1514A(a)(1)(C). "By protecting all persons who report to 'a' supervisor, Congress chose to provide broad protection to whistleblowing employees without narrowly limiting the class of persons to whom they may report wrongdoing." Leshinsky v. Telvent GIT, S.A., 942 F. Supp. 2d 432, 448 (S.D.N.Y. 2013). Therefore, the fact that plaintiff reported his concerns not to Suarez, but to Andrud—who, as a supervisor and a partner on the suspected transactions, likely had authority to investigate or terminate misconduct—is sufficient for his retaliation claim.

ii.    Knowledge and Causation

Next, defendants argue plaintiff fails to show that Suarez was aware of plaintiff's complaints and that plaintiff fails to establish any link between his complaints and his termination.

The Court finds plaintiff has presented thin yet sufficient evidence that Suarez was aware of plaintiff's complaints and that the complaints were a factor in his termination. According to plaintiff, although he did not submit his actual complaints directly to Suarez, Suarez "instructed" plaintiff to submit the complaints to Andrud. (Doc. #262-23 at 264:7–22). While a jury may

choose not to credit plaintiff's testimony, his testimony is not inherently contradictory to the point of being facially implausible.  It is plausible, for example, that plaintiff previewed his concerns to Suarez and that Suarez directed him to bring them instead to Andrud, who was the partner on the suspected transactions.  In any event, plaintiff's testimony is enough to create a genuine issue of material fact as to whether Suarez had knowledge of plaintiff's complaints.

As for causation, plaintiff has presented sufficient evidence for a reasonable jury to conclude that his complaints were a factor in his termination.  Plaintiff presented concerns about financial improprieties to Andrud in early 2018 and, by July 2018, Suarez instructed plaintiff to look for another role.  Moreover, another employee who filed a similar complaint, Gotlieb, was terminated shortly after he raised his concerns and met with IBM lawyers in June or July 2018. (Doc. #271 ¶ 28).  Finally, Andrud was terminated shortly after he reported on Gotlieb's complaint.  Thus, in assessing plaintiff's termination in the context of these two other terminations, a reasonable jury could conclude that plaintiff's complaints were a factor in his termination.

It may well be that a jury will discredit plaintiff's sequence of events.  But that possibility precludes the granting of summary judgment.

For the foregoing reasons, the Court finds there exist genuine issues of material fact as to whether plaintiff engaged in protected activity, defendants were aware of that protected activity, and the protected activity was a factor in plaintiff's termination.  Therefore, plaintiff has met his burden of demonstrating that a reasonable jury could determine that plaintiff has made a prima facie showing of retaliatory discharge.  See Ashmore v. CGI Grp. Inc., 138 F. Supp. 3d at 340–41.

       c.    <u>Non-Retaliatory Rationale</u>

Defendants offer no non-retaliatory rationale for plaintiff's termination. Instead, defendants dispute only whether plaintiff has made out a <u>prima facie</u> case. As noted above, because a reasonable jury could conclude plaintiff has made out a <u>prima facie</u> case, defendants' contentions to the contrary are insufficient at the summary judgment stage.

Accordingly, defendants are not entitled to summary judgment on plaintiff's retaliatory discharge claim.

## CONCLUSION

The motion to preclude the testimony of plaintiff's expert is GRANTED.

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's unjust enrichment and retaliatory discharge claims may proceed. All other claims are dismissed.

The Clerk is instructed to terminate the motions. (Doc. #259, 293, 296).

The Court will conduct a case management conference on July 16, 2025, at 2:30 p.m. to be held at the White Plains courthouse, Courtroom 620, at which time counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what good faith efforts they have made and will continue to make to settle this case.

Dated: June 17, 2025
      White Plains, NY

                        SO ORDERED:

                        Vincent L. Briccetti
                        United States District Judge